(90 P.3d 954)
No. 90,437

MARILYN LABRA, *Appellant/Cross-appellee*, and BRUNO LABRA, *Plaintiff*, v. MID-PLAINS CONSTRUCTION, INC., PLAINS REDI-MIX, LTD., and RONALD EAKES, Individually, *Appellees/Cross-appellants*.

Opinion filed May 21, 2004.

*Frank J. Kamas,* of Render Kamas, L.C., of Wichita, for appellant/cross-appellee.

*Alan L. Rupe* and *Georgina R. Adami,* of Kutak Rock, LLP, of Wichita, and *Mark E. Fern,* of Fern & Angermayer, L.L.C., of Pittsburg, for appellees/cross-appellants.

Before MALONE, P.J., GREENE, J., and DAVID L. STUTZMAN, District Judge, assigned.

GREENE, J.: Marilyn Labra appeals the district court's entry of summary judgment against her in this sexual harassment action pursuant to the Kansas Act Against Discrimination (KAAD), K.S.A. 44-1001 *et seq.,* arguing that genuine issues of material fact precluded summary judgment. The defendants cross-appeal, requesting that we hold that the damage limitations of K.S.A. 44-1005(k) applicable to administrative proceedings are also applicable to independent civil actions. We reverse the district court's summary judgment and remand for trial, but we decline to address the premature cross-appeal.

### Factual and Procedural Background

Marilyn Labra is a cousin of Ronald Eakes, owner and president of Mid-Plains Construction, Inc. and Plains Redi-Mix, Ltd. Labra started working out of her home for Eakes in 1984 and moved to

the companies' office as a full-time secretary in 1990. The alleged harassment began sometime in 1997, when Eakes returned from a trip with his employees and discussed with Labra what the men had told him about their sex lives. Following this incident, Eakes began discussing his sex life with Labra and making multiple inquiries about hers. Labra also claims that over the next 2-3 years, Eakes engaged her in numerous discussions of a sexually provocative nature, including telling her that she turned him on, telling her that he fantasized about her in the shower, and telling her several times that he had masturbated in the office restroom immediately after discussing sexual topics with her. Specifics of these claims are detailed below. During this time frame, Eakes allegedly propositioned Labra, but Labra declined the offer.

Labra contends that she was never the aggressor in such discussions and conduct but merely responded to Eakes' behavior because she feared for her job and thought she might help Eakes get counseling for his problems. She contends that on some occasions she asked Eakes to stop the "stuff" he was doing. After requesting that the behavior be abated on one occasion in late 1998, Eakes complied for a time but then renewed his misconduct sometime during 1999.

Sometime in early 2000, Eakes suggested that Labra make an appointment for breast cancer screening in Garden City, and she later learned that he planned to accompany her on the trip. Eakes offered her $3,400 in cash, a negligee, and a diamond necklace if she would agree to have sex with him on the trip. According to Labra, when Eakes learned that she had arranged to take her son on the trip, he was disturbed and he offered her an additional $1,000 to leave the son at home. Sometime after the trip failed to materialize, Eakes asked Labra to find someone with whom he could have an affair. She suggested another local woman, which prompted Eakes to inquire whether she was trying to "get [him] to think about someone else" so he would "leave [her] alone."

In May 2000, Eakes told Labra that he had made the decision to lay off her husband (who also worked for the companies) or put him to work on a construction crew, and Labra contends that this was motivated by Eakes' desire to gain better opportunities to be

with Labra. Shortly thereafter, Labra secretly tape-recorded a conversation with Eakes wherein he admitted propositioning her, and then both she and her husband, Bruno Labra, resigned their positions with the companies.

After exhausting their administrative remedies, Labra and her husband filed suit on July 6, 2001, against Eakes, Mid-Plains, and Plains Redi-Mix under the KAAD, alleging sexual harassment and hostile work environment, constructive termination, quid pro quo harassment, and intentional infliction of emotional distress.

After discovery had closed, the defendants filed a motion for summary judgment, which the district court granted following a January 16, 2003, hearing. Concerning the hostile work environment claim, the district court found that Labra had failed to adequately demonstrate that Eakes' conduct was unwelcome and that the conduct was sufficiently severe or pervasive to be actionable. The court also issued an advisory opinion that should the matter be remanded for trial the $2,000 limitation on incidental damages for pain, suffering, and humiliation within K.S.A. 44-1005(k) was inapplicable to independent civil actions filed under the KAAD.

Marilyn Labra filed a timely appeal, but Bruno Labra perfected no appeal. Moreover, Labra apparently abandoned her claims of constructive termination and quid pro quo harassment. The defendants timely cross-appealed the district court's advisory ruling concerning the inapplicability of the statutory damage limitations.

## Standard of Review

Our standard for reviewing the district court's entry of summary judgment is well known:

" 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could

differ as to the conclusions drawn from the evidence, summary judgment must be denied.' [Citations omitted.]" *Bracken v. Dixon Industries, Inc.*, 272 Kan. 1272, 1274-75, 38 P.3d 679 (2002).

" 'An issue of fact is not genuine unless it has legal controlling force as to the controlling issue. The disputed question of fact which is immaterial to the issue does not preclude summary judgment. If the disputed fact, however resolved, could not affect the judgment, it does not present a genuine issue of material fact.' [Citations omitted.]" *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402 (2000).

Although federal cases construing Title VII of the federal Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (2000), are not controlling, they are persuasive authority in the interpretation and application of the KAAD. *Woods v. Midwest Conveyor Co.*, 231 Kan. 763, 767, 648 P.2d 234 (1982); see *Kansas Human Rights Comm'n v. Dale*, 25 Kan. App. 2d 689, 692, 968 P.2d 692 (1998). We further note that summary judgment is seldom appropriate in employment discrimination cases. See, *e.g.*, *O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999).

### The District Court's Ruling and Rationale

The district court concluded that defendants were entitled to judgment as a matter of law on two separate grounds: (i) Labra failed to show that the behavior was unwelcome and (ii) Labra failed to show that Eakes' behavior was sufficiently severe or pervasive. The court's memorandum order included the following conclusions:

"After reviewing Mrs. Labra's deposition and the briefs submitted, it is evidence that Plaintiffs have not shown that Mr. Eakes' conduct was unwelcome. . . . [T]here was no mention made that she was subjected to anything unwelcome until after learning Mr. Eakes was changing her husband's employment. . . .

. . . .

"The Court finds Mrs. Labra has failed to present evidence constituting sufficiently severe or pervasive behavior. Mr. Eakes' conduct was not physically threatening or humiliating. It did not unreasonably interfere with Mrs. Labra's job performance. The conduct occurred over a period of two or three years, and most involved the utterances which were of a sexual nature but during which discussions ensued in which Mrs. Labra willingly participated. This environment does not meet the baseline criteria to allow for a sexual harassment/hostile work environment claim to continue."

The court specifically relied upon several federal cases as establishing the baseline requirements for a claim of this nature, including *Shepherd v. Comptroller Public Accounts of Texas*, 168 F.3d 871 (5th Cir. 1999), *Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999), *Adusumilli v. City of Chicago*, 164 F.3d 353 (7th Cir. 1998), and *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333 (7th Cir. 1993).

### *Did the District Court Err in Concluding Labra Did Not Sufficiently Establish that Eakes' Conduct was Unwelcome?*

The defendants suggested it was uncontroverted that Labra never told Eakes that his conduct was unwelcome. Labra's testimony on this subject, as cited by the parties in connection with their statements of uncontroverted fact and controversions thereof, included the following:

"Q. Did you ever say to him, '[Q]uit asking me those questions'?
"A. I don't remember saying, '[Q]uit asking these questions.' *I remember telling him to stop the stuff he was doing.*
"Q. When do you recall asking him that?
"A. When he asked me to go to the motels and stuff with him. *I told him no.* Then—and he said he would quit asking me that and quit saying stuff, and I believed that he would and he didn't.
. . . .
"Q. I understand that when he said, according to you, 'I want to have sex,' you responded no. My question really goes to, when he would ask you questions about sex or your sex life and tell you about his sex life, did you ever say to him, 'Quit saying those kind of things to me'?
"A. I don't know if I ever actually said, '[Q]uit saying those'—*I told him I wasn't having sex with him,* and he kept going on about his stuff. I don't recall if I said that.
. . . .
"Q. You indicated that Mr. Eakes' approaches, my word 'approaches,' slowed down in 1998 after the initial start. Did you say that earlier?
"A. Yes.
"Q. Do you know why they did?
"A. *Because I told him no, and he said he would quit bothering me about it.* And I told him I didn't want to lose my job because I had a family to support, and right there in Plains I didn't want to have to drive to work. And he kept saying he would stop approaching me about it.
. . . .

"A. When Ron told me what he was going to do [meet in Garden City for sex] and *I told him no, that I would not have sex with him,* he waited—

"Q. Is this during the conversation before you [went] to Garden City?

"A. Yes. He waited a while and he came back out and wanted to know if another thousand dollars cash would interest me." (Emphasis added.)

In determining whether the behavior in question is unwelcome for purposes of a sexual harassment claim, "[t]he question is whether under the totality of the circumstances plaintiff indicated by her conduct that the alleged harassment was unwelcome. [Citations omitted.]" *Rahn v. Junction City Foundry, Inc.,* 161 F. Supp. 2d 1219, 1233 (D. Kan. 2001). Moreover, "the conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." 161 F. Supp. 2d at 1233. The question whether particular conduct was indeed unwelcome generally presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 68, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986). Moreover, engaging in or responding to sexual banter does not necessarily waive a plaintiff's legal protections against unwelcome harassment. See, *e.g., Burns v. McGregor Electronic Industries, Inc.,* 989 F.2d 959, 963 (8th Cir. 1993); *Swentek v. USAIR, Inc.,* 830 F.2d 552, 557 (4th Cir. 1987).

The district court acknowledged that Labra refused to have sex with Eakes, but the court accepted the defendants' characterization that Labra never "complained about behavior other than the two sexual advances." We disagree. Viewing the testimony most favorably to Labra, her statement that she told him "to stop the stuff he was doing," coupled with the express refusals to have sex, establish a genuine issue of material fact on this issue. Moreover, Eakes' abatement of the behavior for some period of time after she told him to cease and his statements in response to Labra's suggestion of another woman with whom to have an affair suggest that Eakes understood that his behavior was not welcome, thus further supporting our conclusion that a fact question on this issue precluded summary judgment.

In summary, we believe that Labra sufficiently controverted the defendants' proposed fact that "she never told [Eakes] his conduct was inappropriate or asked him to stop." From our analysis of the Labra testimony quoted or referenced above, we conclude that a jury could determine that Eakes' conduct was unwelcome under the totality of the circumstances. Defendants were not entitled to judgment as a matter of law on this issue.

### *Did the District Court Err in Concluding that Labra's Claims were Insufficient to Establish Severe and Persistent Misconduct to Support Her Sexual Harassment Claim?*

The testimony cited in support and in opposition to the purported uncontroverted facts established the following details of Labra's claims of purported harassment:

- Sometime in 1997 Eakes took some of his male employees on a trip to Las Vegas. When he returned, he repeated to Labra what the men told him about their sex lives.
- Eakes asked Labra questions about her sex life, and Labra would answer them "because she wanted him to realize that he needed to get some help for his wife or get counseling for them . . . ."
- Eakes asked Labra about adult movies.
- Eakes asked Labra about sexual positions and inquired whether Labra "ever gets on top."
- Labra claims that Eakes would leave the door open while using the bathroom at the office.
- Labra claims that in July 1998, Eakes asked her to have sex with him.
- Between January 1998 and December 1998, Eakes made complimentary remarks to Labra about her perfume, how she looked, how small her waist was, and how she turned him on. The frequency of such comments was characterized by Labra as "a lot"—no less than five times each.
- During 1999 and 2000, Labra alleges that Eakes told her he masturbated while thinking about her and that he fantasized about her while he showered.

- In January 2000, Eakes initiated discussions with Labra about the frequency of her sexual relations with her husband.
- In 2000, Eakes urged Labra to set up an appointment in Garden City for breast cancer screening; after the appointment was made, Labra claims that Eakes told her he wanted to go along and that he offered her cash and gifts if she would agree to have sex with him on the trip.
- Labra claims that after she scheduled her son out of school to accompany her on the trip, Eakes offered her an additional $1,000 to leave the son at home.
- In May 2000, Labra claims that Eakes told her he wanted to find someone to have an affair with while his wife was out of town.
- Labra claims that Eakes' conduct interfered with her job performance. She explained, "I was nervous thinking that I was going to be there alone with him, and I was not concentrating as good as I should have. Didn't know if I was making mistakes because [of] a lack of concentration."

In order to be actionable, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. Whether an environment is sufficiently hostile or abusive must be determined by looking at all the circumstances, including frequency of discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Faragher v. Boca Raton,* 524 U.S. 775, 787-88, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998); see *Garvey Elevators, Inc. v. Kansas Human Rights Comm'n,* 265 Kan. 484, 493, 961 P.2d 696 (1998). Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not suffice. *Faragher,* 524 U.S. at 788. The severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is " ' "quintessentially a question of fact." ' [Citations omitted.]" *O'Shea,* 185 F.3d at 1098. When allegations are made which, if believed by a jury, may constitute a severe and hostile work envi-

ronment, summary judgment is inappropriate. *Jones v. Rent-a-Center, Inc.*, 240 F. Supp. 2d 1167, 1181-82 (D. Kan. 2002).

The United States Supreme Court recently commented that the standards for hostile environment are intended to filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing. *Faragher*, 524 U.S. at 788. We concede that synthesizing federal case law in this area is problematic, but we respectfully disagree with the district court that Labra's claims are insufficient, even if we rely solely on the cases cited in the court's memorandum order.

Cases cited and relied upon by the district court address the insufficiency of isolated offensive incidents. In *Shepherd*, 168 F.3d at 872-75, the conduct deemed insufficient included incidents of unwanted touching on the arm, making offensive remarks, and attempting to look down an employee's dress. In *Mendoza*, 195 F.3d at 1247-52, the conduct deemed insufficient included one instance in which a supervisor said to an employee "I'm getting fired up," one occasion in which a supervisor rubbed his hip against an employee's hip, two instances in which a supervisor made a sniffing sound while looking at an employee's groin area, one instance of sniffing without looking at her groin, and a supervisor's constant following and staring at an employee in a very obvious fashion. In *Adusumilli*, 164 F.3d at 361-62, the conduct deemed insufficient included sexual innuendo about bananas, staring at breasts, touching an arm, poking at buttocks, and making unnecessary eye contact. In *Weiss*, 990 F.2d at 337, the conduct deemed insufficient was that the employee's supervisor asked her for dates, called her a "dumb blonde," put his hand on her shoulder several times, placed "I love you" signs in her work area, and attempted to kiss her in a bar. These cases stand for the principle that isolated incidents of conduct that may be merely offensive or boorish are not actionable. See *Shepherd*, 168 F.3d at 874; *Barden v. Cargill Inc.*, 176 F. Supp. 2d 1103, 1112 (D. Kan. 2001).

The commonality of these cases is that the conduct deemed insufficient was isolated in the sense that the employee was not the target of a persistent pattern of sexually provocative conduct that

was intended to satisfy the supervisor's prurient desires in the workplace and beyond. Eakes' persistent sexually provocative discussions with Labra, coupled with his alleged exhibitionism, masturbation, and outright attempts to achieve sexual encounters with Labra at virtually any cost, move the facts of this case significantly beyond those cases relied upon by the district court. Faced with facts like those before us, other courts have had little difficulty in finding that the baseline requirements for a claim of hostile environment were satisfied. See, *e.g.*, *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993); *Smith v. Norwest Financial Acceptance, Inc.*, 129 F.3d 1408, 1412-15 (10th Cir. 1997); *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996 (10th Cir. 1996); *Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 781-86 (10th Cir. 1995); *Rahn*, 161 F. Supp. 2d at 1228-35; *Cadena v. Pacesetter Corp.*, 18 F. Supp. 2d 1220, 1226-28 (D. Kan. 1998); *Haug v. City of Topeka, Equipment Management Div.*, 13 F. Supp. 2d 1153, 1162 (D. Kan. 1998).

We conclude that Labra's allegations, if believed by a jury, are sufficiently severe and pervasive to satisfy the baseline requirements for her claim of sexual harassment and hostile work environment, and that the district court erred in granting summary judgment against her as a matter of law.

We decline to address the cross-appeal requiring construction and application of the KAAD as restricting damage recoveries in actions of this nature. Until liability has been established, issues of damages are premature, and we decline to issue an advisory opinion. See *Commerce Bank v. Liebau-Wood & Assocs., L.P.*, 28 Kan. App. 2d 674, 682, 20 P.3d 88 (2001).

Reversed and remanded for trial.