IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 112,056

In the Matter of TIMOTHY H. HENDERSON, District Judge,
*Respondent*.

ORIGINAL PROCEEDING RELATING TO JUDICIAL CONDUCT

Original proceeding in discipline. Opinion filed February 27, 2015. Ninety-day suspension and education requirement.

*Todd N. Thompson*, of Thompson Ramsdell Qualseth & Warner, P.A., of Lawrence, argued the cause for the Commission on Judicial Qualifications.

*Thomas D. Haney*, of Stevens & Brand, L.L.P., of Topeka, argued the cause for the respondent, and *Timothy H. Henderson*, respondent, argued the cause pro se.

*Per Curiam*:  This is an original disciplinary proceeding against Honorable Timothy H. Henderson, District Judge of the Eighteenth Judicial District, sitting in Sedgwick County (Respondent). The matter was investigated by Panel A of the Kansas Commission on Judicial Qualifications (Commission), following which that panel docketed a formal complaint against Respondent and gave due notice. See Supreme Court Rule 611(b) (2014 Kan. Ct. R. Annot. 801) (discussing procedure for filing of formal proceedings). The complaint alleged three counts of judicial misconduct constituting various violations of Canons 1 and 2 of the Kansas Code of Judicial Conduct (the Code), as will be discussed in detail below. See Rule 601B of the Rules of the Kansas Supreme Court (2014 Kan. Ct. R. Annot. 751) (containing the Code).

After being served with the Notice of Formal Proceedings, Respondent timely filed an Answer, in which he denied that his conduct violated the Code. The matter was

1

then set for a public hearing before Panel B of the Commission (the hearing panel). At the hearing, the Commission's investigating attorney presented evidence and argument in support of the formal complaint and Respondent's attorney presented evidence and argument on his behalf.

Subsequently, the hearing panel announced its decision through a written document, entitled "Findings of Fact, Conclusions of Law, and Recommendation," in which it found Code violations under all three counts and recommended that Respondent be disciplined by public censure. The panel's written report, in relevant part, stated as follows:

"**AMENDED**
"**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND RECOMMENDATION**

"On March 21, 2014, Panel A of the Commission on Judicial Qualifications issued a Notice of Formal Proceedings, pursuant to Rule 611(b) (2013 Kan. Ct. R. Annot. 776), against Timothy H. Henderson, District Judge of the 18th Judicial District. The Notice of Formal Proceedings alleged that Respondent did engage in certain conduct which violated Rules 1.2 and 1.3 of Canon 1 (2013 Kan. Ct. R. Annot. 733-735) and Rules 2.2, 2.3, and 2.9 of Canon 2 (2013 Kan. Ct. R. Annot. 735-740).

"On April 21, 2014, the Notice of Formal Proceedings was amended at Count II, Paragraph 5 to read 'pending or impending matter.'

"On May 15-16, 2014, a public hearing was held in Topeka, Kansas, before Panel B of the Commission on Judicial Qualifications, at which hearing the Panel accepted stipulations and heard evidence on the record.

"Members of the Panel present for this hearing were: Jeffery A. Mason, Chair; Honorable Robert J. Fleming; Honorable David J. King; Honorable Nicholas St. Peter, and Diane S. Worth. Edward G. Collister, Jr., and Adam M. Hall appeared in support of

2

the Notice of Formal Proceedings. Respondent appeared personally and through counsel, Thomas J. Berscheidt.

"Having heard the evidence and arguments of counsel, the Panel makes the following findings of fact, conclusions of law, and recommendation to the Supreme Court of the State of Kansas concerning discipline.

## "COUNT I
## "FINDINGS OF FACT

"The Panel concludes the following facts are established by clear and convincing evidence. See *In re Rome*, 218 Kan. 198, 542 P.2d 676 (1975).

"1. Respondent engaged in harassment as well as gender bias by making repeated inappropriate and offensive comments in the presence of female attorneys employed by the Sedgwick County District Attorney's Office.

"2. The Respondent's conduct was directed toward multiple female attorneys, including Melissa Green, an attorney employed by the Office of the District Attorney, Juvenile Division, in the 18th Judicial District since January 2013. Respondent engaged in incidents of inappropriate, harassing behavior towards Melissa Green.

"3. While Ms. Green was employed with the now-named Department for Children and Families prior to her employment with the Office of the District Attorney, Ms. Green was assigned to Respondent's court for approximately five years. Ms. Green testified that, in approximately October 2006, at a time when Respondent and Ms. Green were in the courtroom alone, Respondent told Ms. Green that after his wife gave birth the doctor asked Respondent if he wanted an extra stitch in Respondent's wife for Respondent's pleasure.

"4. Respondent testified at the hearing that, although the doctor did in fact make the statement, Respondent denied repeating it to Ms. Green. The Panel does not find

3

Respondent's testimony credible because the incident occurred years before Ms. Green knew Respondent. She would not have had contemporaneous knowledge of the incident.

"5. While Ms. Green was employed with the Department for Children and Families prior to her employment with the Office of the District Attorney, Respondent regularly made sporadic and pervasive comments of a sexual or suggestive nature. Two examples were telling Ms. Green she was the girl who wouldn't date him in high school and remarking on another occasion, 'whatever, prom queen.' Ms. Green testified that, although each comment standing alone might not have been offensive, it was the cumulative effect of so many of these comments that became offensive.

"6. While Ms. Green was employed with the Office of the District Attorney, Ms. Green made and delivered an over-the-hill birthday cake for Jennifer Redd's birthday party, at the request of Respondent. Respondent pointed to a representation of an old couple crossing the street and laughed, stating it looked like she was giving him the 'reach around.' Ms. Green testified at the hearing that this is a comment of a sexual nature from the gay community and could not have been used innocently.

"7. Initially, Respondent testified that the comment was a reference to 'feeling the aches and pains' of his age and that before long his wife would have to 'reach around and help me like that.' Later he testified that he intended the comment to be a joke about his own size. The Panel did not find Respondent's explanations credible.

"8. On September 10, 2013, after a difficult trial, the Respondent asked Ms. Green if she felt the tension between herself and the father in the case. Ms. Green testified at the hearing that Respondent placed particular emphasis on the word 'tension.' Based on her past experiences with Respondent, Ms. Green interpreted the comment to mean sexual tension. Respondent repeated the question several times, to Ms. Green's embarrassment, and she asked him to stop. She testified that she found the comments hurtful and disrespectful following her professional work with a difficult witness. Kristi Topper, Assistant District Attorney, advised Ms. Green Respondent discussed the hearing and the sexual tension between Ms. Green and the father the next day in the hallway with

two male attorneys. Ms. Topper specifically testified at the hearing that Respondent used the word 'sexual' with regard to the tension.

"9. Melissa Green also testified about another comment Respondent made in February 2013 in the law library. Respondent overheard women attorneys joking about shaving their legs and inserted himself into the conversation saying, 'Well, your legs rub together when you walk.' The women were embarrassed, and Ms. Green told Respondent to 'shut up.' Kristi Topper was also present and corroborated Ms. Green's testimony. Ms. Topper found Respondent's comment highly offensive.

"10. The Respondent's conduct was directed toward multiple female attorneys, including Amanda Marino. Respondent engaged in incidents of inappropriate, harassing behavior towards Amanda Marino, an Assistant District Attorney whose practice focuses primarily on children in need of care.

"11. Respondent made inappropriate comments in late 2011 insinuating that Ms. Marino liked to have a lot of sex. The comments were based on a vacation she was taking to Las Vegas and a statement that she liked to play a slot machine called Sex in the City. Her comment was apparently cut short, resulting in a statement that she liked sex. Respondent repeated the joke numerous times to Ms. Marino's embarrassment.

"12. Respondent joked about whether Ms. Marino was pregnant or would be pregnant after vacations. This subject continued for a few years. One incident in particular occurred in 2013 when Respondent inquired across the courthouse parking lot whether Ms. Marino had 'another one on the way' after she returned from vacation. Respondent testified these comments were not sexual but rather celebrated children. The Panel did not find this explanation credible.

"13. In September 2013, there was a CINC case involving a young girl from China forced to work long hours in a financial-type human trafficking. Ms. Marino was in the law library, discussing house work. The Respondent asked Ms. Marino if she needed someone to help her with house work because he knew a young Asian girl who was available.

5

"14. On another occasion, Respondent encouraged Ms. Marino to ask his court reporter, Jennifer Redd, about her back pain. Twice, Respondent said, 'Go ahead, ask her where she's been all weekend.' When Ms. Marino did not respond, Respondent commented, 'Yeah, her back hurts because she's been with her boyfriend all weekend.' On the witness stand, Ms. Redd denied that Respondent made the comment, but she did corroborate that she had a sore back for a few weeks.

"15. Ms. Marino complained to her supervisor, Ron Paschal, in 2012 about Respondent's conduct and was re-assigned so that she no longer appeared before him. She testified that she didn't report the incidents before because Respondent was a judge and she felt he would retaliate.

"16. The Respondent's conduct was directed toward multiple female staff members, including Sandra L. (Charbonneau) Lessor. Respondent engaged in incidents of inappropriate, harassing behavior towards Ms. Lessor, Assistant District Attorney.

"17. Ms. Lessor and Respondent have worked together in some capacity for approximately 15 years. Between October 21, 2012, and July 5, 2013, Ms. Lessor heard Respondent make numerous comments regarding women getting pregnant on their honeymoons. Around January 23, 2013, Respondent made a similar comment to her.

"18. Ms. Lessor heard Respondent make inappropriate comments of a sexual nature to Amanda Marino regarding Ms. Marino's trip to Las Vegas.

"19. When asked why she did not file a complaint against Respondent, she testified at the hearing, 'Who wants to take on the boss?' Other Assistant District Attorneys who testified against Respondent did not come forward initially with complaints about the judge's conduct because they were each afraid of his ability to jeopardize their careers. The judge had made clear that he was well connected politically.

"20. It was the Assistant District Attorneys' supervisor, Angela Wilson, who made the decision that something needed to be done about Respondent's behavior toward

6

these women when she saw a pattern in his behavior. She was concerned about the District Attorney's liability for sexual harassment, and she determined it would violate her own ethical duties not to see that a report was made. Ultimately, it was the decision of the District Attorney, Marc Bennett, to file the ethical complaint against Respondent.

"21. In rebuttal to direct testimony by Lynette Hermann, a former Assistant District Attorney called on behalf of Respondent, that frivolous allegations of sexual innuendo had been made against Judge Henderson 'to further an agenda' of the District Attorney's Office, Court Services Officer Andrew Hinshaw testified that he had worked around Respondent since November 2006 and had observed Respondent make comments to females that Hinshaw characterized as sexual and inappropriate. He testified, for example, that right after Melissa Green joined the District Attorney's Office Respondent made a comment at the end of a hearing in his courtroom that she was the 'new hot DA.' Mr. Hinshaw is employed by the Sedgwick County Juvenile Court.

"22. Knowledge of the nature of Judge Henderson's humor extended beyond these female attorneys. Lanora Franck, then Juvenile Justice Education Liaison for the Sedgwick County Department of Corrections, testified that Respondent frequently would make sexual comments in a professional setting.

"23. In an evidentiary deposition taken on May 13, 2014, Chief Judge James Fleetwood of the 18th Judicial District responded to the following questions posed by counsel for the Commission on Judicial Qualifications:

'Q.     Do you have any personal experience with sort of off color or blue humor being used by Judge Henderson?
'A.     Yes.
'Q.     And in your personal experience is that off color or blue humor of a sexual nature?
'A.     Yes.'

"24. In response to Chief Judge Fleetwood's testimony, Respondent testified as follows:  'A lot of times judges get together, we get together for lunch, we talk about our

7

jobs, we talk about our cases. The case I'm thinking that Judge Fleetwood is—I can't speculate— obviously for the purposes of this hearing didn't ask me if my memory was the same as his memory, is we have a gentleman in Topeka—excuse me, in Wichita named King David David. And King David David whenever he would have sexual relationships with a woman he would collect her [sic] undergarments and put it [sic] in a Brandy sniffer on his fireplace mantle. I recall talking over lunch about what a crazy strange case I had in that regard. I'm assuming that's what he means. We'd talk about our cases. Sometimes cases are sexual and those things get talked about. Judge Fleetwood is a very devout Morman Elder and I'm sure I've used vulgar language or a cuss word at times that probably offended him. I told him afterwards I do apologize if I did offend you.' The Panel did not find Respondent's explanation credible.

## "COUNT I
## "CONCLUSIONS OF LAW

"25. The Notice of Formal Proceedings alleges in Count I that Respondent's conduct violated the provisions of Rule 1.2 of Canon 1 and Rule 2.3 of Canon 2.

"26. CANON 1 provides:  [']A JUDGE SHALL UPHOLD AND PROMOTE THE *INDEPENDENCE, INTEGRITY,* AND *IMPARTIALITY* OF THE JUDICIARY, AND SHALL AVOID *IMPROPRIETY* AND THE APPEARANCE OF IMPROPRIETY.[']

"27. RULE 1.2 provides:  [']A judge shall act at all times in a manner that promotes public confidence in the *independence, integrity,* and *impartiality* of the judiciary, and shall avoid *impropriety* and the appearance of impropriety.[']

"Comment [5] of Rule 1.2 provides further insight.

['][5]    Actual improprieties include violations of law, court rules, or
provisions of this Code. The test for appearance of impropriety is
whether the conduct would create in reasonable minds a perception that
the judge violated this Code or engaged in other conduct that reflects

8

adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge.[']

"28. CANON 2 provides: [']A JUDGE SHALL PERFORM THE DUTIES OF JUDICIAL OFFICE *IMPARTIALLY,* COMPETENTLY, AND DILIGENTLY.[']

"29. RULE 2.3 provides, in relevant part:
['](B) A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in *harassment,* including **but not limited to** [emphasis added] bias, prejudice, or *harassment* based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation . . . .[']

"Comments [2-4] of Rule 2.3 provide further insight.

['][2] Examples of manifestations of bias or prejudice include but are not limited to epithets; slurs; demeaning nicknames; negative stereotyping; attempted humor based upon stereotypes; threatening, intimidating, or hostile acts; suggestions of connections between race, ethnicity, or nationality and crime; and irrelevant references to personal characteristics. Even facial expressions and body language can convey to parties and lawyers in the proceeding, jurors, the media, and others an appearance of bias or prejudice. A judge must avoid conduct that may reasonably be perceived as prejudiced or biased.

['][3] Harassment, as referred to in paragraphs (B) and (C), is verbal or physical conduct that denigrates or shows hostility or aversion toward a person on bases such as race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation.

9

['][4] Sexual harassment includes but is not limited to sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that is unwelcome.[']

"30. The Panel unanimously finds that Respondent's conduct, established by clear and convincing evidence, violated Rule 1.2 of Canon 1 and Rule 2.3 of Canon 2.

"31. Respondent engaged in pervasive comments of a sexual nature which were offensive and demeaning to female attorneys in the District Attorney's Office.

"32. The complainants' recollections were clear and unequivocal; whereas, the Panel found Respondent's denials not to be credible.

"COUNT II
"FINDINGS OF FACT

"The Panel concludes the following facts are established by clear and convincing evidence. See *In re Rome*, 218 Kan. 198, 542 P.2d 676 (1975).

"33. On Saturday, May 11, 2013, Respondent sent an email from his personal email account to Wjkahrs [later identified as William Jeffrey Kahrs, an employee of the Department for Children and Families] and Diane Bidwell [then head of the Wichita Regional Office of DCF] regarding Wichita attorney Martin Bauer's employment in adult guardianship cases. Ms. Bidwell testified at the hearing that she had a prior face-to-face meeting with Respondent on the same subject.

"34. In testimony at the hearing, it was established that Diane Bidwell forwarded the email through the DCF system where it eventually reached Bruce Brown, Assistant Program Director. Testimony at the hearing established that the email traveled from Diane Bidwell, to Gina Hummel, to Leslie Hale, and finally to Bruce Brown. The email from Diane Bidwell to Gina Hummel on May 14, 2013, contained a statement that she (Diane) 'would like to take Martin Pringle off of the list.'

10

"35. In addition to commenting on Martin Bauer's presumed hourly rate, Respondent commented further in the email: 'For many years he [Martin Bauer] handled the life [sic] birth adoptions from Dr. Tiller. Rick Macias can tell you about his very liberal positions on the national adoption attorneys [a]ssociation. Judge Brooks can tell you about the gay adoptions and custodianship's [sic] that he has attempted to establish. Your call of course, but I wanted to make you aware of the situation.'

"36. Respondent admitted at the hearing that he had incorrect information about Martin Bauer's hourly rate and admitted that he expressed a personal political view in the email that he should not have expressed.

"37. Respondent's email exhibits a negative stereotype and/or a hostility or aversion toward Martin Bauer and his beliefs that conveys the appearance of bias and prejudice.

"38. Martin Bauer and his law firm were removed from the DCF appointment list.

"39. Diane Bidwell testified at the hearing that weight was placed on Respondent's view in making the decision to remove Martin Bauer. Leslie Hale testified that Martin Bauer was removed solely because of the email.

"40. The Respondent contacted a represented party about a pending or impending matter and did not notify opposing counsel of the email, thus engaging in an *ex parte* communication.

## "COUNT II
## "CONCLUSIONS OF LAW

"41. The Notice of Formal Proceedings alleges in Count II that Respondent's conduct violated the provisions of Rule 1.2 of Canon 1 and Rules 2.2, 2.3, and 2.9 of Canon 2, as follows:

11

"42. CANON 1 provides:  [']A JUDGE SHALL UPHOLD AND PROMOTE THE *INDEPENDENCE, INTEGRITY,* AND *IMPARTIALITY* OF THE JUDICIARY, AND SHALL AVOID *IMPROPRIETY* AND THE APPEARANCE OF IMPROPRIETY.[']

"43. RULE 1.2 provides:  [']A judge shall act at all times in a manner that promotes public confidence in the *independence, integrity,* and *impartiality* of the judiciary, and shall avoid *impropriety* and the appearance of impropriety.[']

"Comment [5] of Rule 1.2 provides further insight.

['][5] Actual improprieties include violations of law, court rules, or provisions of this Code. The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge.[']

"44. CANON 2 provides:  [']A JUDGE SHALL PERFORM THE DUTIES OF JUDICIAL OFFICE *IMPARTIALLY,* COMPETENTLY, AND DILIGENTLY.[']

"45. RULE 2.2 provides:  [']A judge shall uphold and apply the *law,* and shall perform all duties of judicial office fairly and *impartially.*[']

"Comment [1] of Rule 2.2 provides further insight.

['][1] To ensure impartiality and fairness to all parties, a judge must be objective and open-minded.[']

"46. RULE 2.3 provides, in relevant part:
['](B) A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in *harassment,* including but not limited to bias, prejudice, or *harassment* based upon race, sex,

12

gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation . . . .[']

"47. RULE 2.9 provides, in relevant part:
['](A) A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a *pending or impending matter* . . . .[']

"48. The Panel unanimously finds that Respondent's conduct, established by clear and convincing evidence, violated Rule 1.2 of Canon 1 and Rules 2.2, 2.3, and 2.9 of Canon 2.

"49. Evidence introduced at the hearing established that Respondent exhibited bias or prejudice against attorney Martin Bauer or appealed to the recipient's bias or prejudice to the detriment of Mr. Bauer.

"50. Respondent inappropriately mixed his personal views on socio-political issues with his role as a judge.

"51. Respondent inappropriately engaged in *ex parte* communication about an impending legal action.

## "COUNT III
## "FINDINGS OF FACT

"The Panel concludes the following facts are established by clear and convincing evidence. See *In re Rome*, 218 Kan. 198, 542 P.2d 676 (1975).

"52. Around the end of the school year in June 2012, Respondent approached Lanora Nolan [now Franck], in her capacity as a Board Member of the Wichita Board of Education, and requested that she intervene on behalf of Respondent's wife with the Wichita School District. At the time, Lanora Nolan was the Juvenile Justice Education

13

Liaison for the Sedgwick County Department of Corrections, working with Respondent in a professional capacity. The conversation occurred at the courthouse. Respondent's inquiry concerned a teaching position or, in the alternative, another position within the school district for his wife.

"53. Respondent asked Lanora Nolan to investigate the reason his wife was not offered a contract, if appropriate records had been kept, and if there was any foul play involved. Ms. Nolan looked into the matter and found that Respondent's wife had been offered a contract for a full-time position. Ms. Nolan communicated this information to Respondent. The Respondent contacted Ms. Nolan again and asked if there might be a half-time position available for his wife, as his wife had decided to return to school for further education.

"54. Lanora Nolan felt, at the time, the Respondent was using his position to request her to compromise her position on the Wichita School Board on behalf of his wife. Ms. Nolan [now Franck] testified that there was not pressure in an overt way, but she was influenced by the fact that he was a judge.

"55. Respondent testified at the hearing that, in his passing conversation with Lanora Nolan, he was only concerned about his wife's KPERS rollover. He didn't intend to use his position as a judge to influence her. Respondent's version of the incident, however, is not credible. In fact, it was refuted by the documentary evidence offered in rebuttal testimony by Ms. Nolan.

"56. On rebuttal, Lanora Nolan [now Franck] testified that she did not recall a conversation about KPERS. She produced copies of emails that established Respondent's inquiry was more than a passing one.

"57. On August 7, 2012, Respondent emailed Lanora Nolan with the subject heading Re: wife. Respondent wrote: 'You ever get a chance to look into this?'

"58. On November 14, 2012, Respondent again emailed Lanora Nolan with the subject heading Re: Ann [Respondent's wife]. Respondent wrote: 'Lanora. Did you

14

ever find out if Gateway is willing to consider a .5 math teacher? Tim.'

"59. On November 15, 2012, Lanora Nolan responded:  'Yesterday was the first day back at school and I left a message for the principal.'

## "COUNT III
## "CONCLUSIONS OF LAW

"60. The Notice of Formal Proceedings alleges in Count III that Respondent's conduct violated the provisions of Rules 1.2 and 1.3 of Canon 1, as follows:

"61. CANON 1 provides:  [']A JUDGE SHALL UPHOLD AND PROMOTE THE *INDEPENDENCE, INTEGRITY,* AND *IMPARTIALITY* OF THE JUDICIARY, AND SHALL AVOID *IMPROPRIETY* AND THE APPEARANCE OF IMPROPRIETY.[']

"62. RULE 1.2 provides:  [']A judge shall act at all times in a manner that promotes public confidence in the *independence, integrity,* and *impartiality* of the judiciary, and shall avoid *impropriety* and the appearance of impropriety.[']

"63. RULE 1.3 provides:  [']A judge shall not lend the prestige of judicial office to advance the personal or *economic interests* of the judge or others, or allow others to do so.[']

"Comment [1] of Rule 1.3 provides further insight.

['][1] It is improper for a judge to use or attempt to use his or her position
to gain personal advantage or deferential treatment of any kind. For
example, it would be improper for a judge to allude to his or her judicial
status to gain favorable treatment in encounters with traffic
officials . . . .[']

15

"64. The Panel unanimously finds that Respondent's conduct, established by clear and convincing evidence, violated Rules 1.2 and 1.3 of Canon 1.

"65. Evidence introduced at the hearing established that Respondent asked Ms. Nolan [now Franck] for a favor to gain an employment opportunity for his wife.

## "RECOMMENDATION TO THE SUPREME COURT

"The Panel has considered all of the testimony and evidence, had the opportunity to observe the demeanor of witnesses testifying at the hearing, and it is the Panel's considered judgment that many of Respondent's explanations, or denials, of the allegations are not credible. In some instances, Respondent's testimony changed in questioning on the same subject. In other instances, his testimony was contradicted by evidence the Panel found extremely credible.

"Pursuant to Supreme Court Rule 620 (2013 Kan. Ct. R. Annot. 780), based upon the foregoing Findings of Fact and Conclusions of Law, and based on the unanimous vote of the members, the Panel recommends to the Supreme Court of the State of Kansas that Respondent be disciplined for the violations set forth above by public censure."

After the panel submitted its written decision, Respondent filed a statement with this court, advising that he "does not wish to file exceptions to the Findings of Fact and Conclusions of Law and does not request to reserve the right to address the Supreme Court with respect to the disposition of this case unless counsel for the Commission of Judicial Qualifications is granted authority to address the Court." Pursuant to Supreme Court Rule 623(d) (2014 Kan. Ct. R. Annot. 808), "[a] hearing panel's findings of fact and conclusions of law shall be conclusive and may not be challenged by respondent unless exceptions have been timely filed." Accordingly, a hearing was conducted before this court with respect to the disposition of the case.

16

The hearing panel found that the charges against Respondent had been proven by clear and convincing evidence. See Supreme Court Rule 620(a) (2014 Kan. Ct. R. Annot. 806) (requiring clear and convincing evidence). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]). As noted, given Respondent's statement declining to file exceptions to the hearing panel's findings of fact, they are deemed conclusive.

Moreover, our review of the record confirms that the panel's conclusions of law were supported by clear and convincing evidence. Accordingly, we adopt those conclusions and find that the Respondent violated Rules 1.2 and 1.3 of Canon 1 (2014 Kan. Ct. R. Annot. 759), and Rules 2.2, 2.3, and 2.9 of Canon 2 (2014 Kan. Ct. R. Annot. 761) of the Kansas Code of Judicial Conduct.

The remaining task for this court is to "impose such discipline or make such other disposition as may be deemed proper and just." Supreme Court Rule 623(d) (2014 Kan. Ct. R. Annot. 808). The hearing panel unanimously recommended to this court that Respondent be disciplined by public censure. See Supreme Court Rule 620 (2014 Kan. Ct. R. Annot. 806) ("'Discipline' means public censure, suspension, or removal."). Interestingly, the panel did not follow the recommendation of the hearing panel examiner, who asked the panel to temporarily suspend and then remove the Respondent, stating: "In the absence of a respondent who is taking responsibility for what happens, accepts what had occurred, and is willing to change his conduct, we see no alternative than to remove him." The Respondent takes no exception to the panel's recommendation of public censure.

17

But the hearing panel's recommendation as to the disposition of the case is not binding upon this court. *In re Robertson*, 280 Kan. 266, 269, 120 P.3d 790 (2005) (citing *In re Platt*, 269 Kan. 509, 528, 8 P.3d 686 [2000]). We "may refer the matter back to a hearing panel for such further proceedings as the court may direct, reject the recommendations, dismiss the proceedings, order discipline or compulsory retirement, or make such other disposition as justice may require." Supreme Court Rule 623(f) (2014 Kan. Ct. R. Annot. 809).

In *In re Robertson*, this court opined that "[t]he aim of judicial discipline 'is the maintenance of the honor and dignity of the judiciary and the proper administration of justice rather than the punishment of the individual.'" 280 Kan. at 273 (quoting *State ex rel. Comm'n on Judicial Qualifications v. Rome*, 229 Kan. 195, 206, 623 P.2d 1307 [1981]). The *Robertson* court discussed helpful factors to use in evaluating the appropriate judicial discipline to impose, to-wit: "the extent of the misconduct, the nature of the misconduct, the judge's conduct in response to the Commission's inquiry and disciplinary proceedings, the judge's discipline record and reputation, and the effect the misconduct had upon the integrity and respect for the judiciary." *Robertson*, 280 Kan. at 270 (citing Gray, Handbook for Members of Judicial Conduct Commissions 15 [American Judicature Society 1999]).

Looking first at the nature of the misconduct, the evidence established that the Respondent exhibited extremely poor judgment or blatantly misused the power of his judicial position in multiple ways. He made offensive and demeaning comments of a sexual nature to female attorneys and staff members. Those victims endured the harassment over an extended period of time because they feared Respondent would use his professed political connections to jeopardize their careers. The Respondent interfered with an attorney's practice by sending an ex parte email communication to the attorney's

18

client that expressed bias or prejudice toward the attorney, founded in part on the Respondent's apparent disagreement with the attorney's moral beliefs. Finally, the Respondent tried to use the influence of his judicial position for personal gain by brokering an employment opportunity for his wife. These offenses were not inadvertent "technical" missteps. The nature of Respondent's misconduct struck at the very heart of the honor and dignity that the public expects and the legal profession demands from a judge.

The extent of Respondent's misconduct was wide-ranging, especially with respect to the first count of the three-count complaint. What the Respondent's Chief Judge labeled "off color or blue humor" was pervasive and ongoing. The Respondent subjected multiple female attorneys and staff members to repeated inappropriate and offensive comments for literally years. Moreover, often the comments directed at a particular female were made in front of other persons, thereby further broadcasting the denigration of the judiciary's integrity.

The Respondent's conduct in response to the Commission's inquiry and the disciplinary proceedings does not suggest that he grasped the nature or severity of his actions. In his Answer, Respondent denied all Code violations, including "emphatically" denying the alleged violation of Canon 2, Rule 2.3 (2014 Kan. Ct. R. Annot. 762) in Count 1, which was based on the Respondent's offensive and demeaning comments to various females. At his panel hearing, Respondent's attempted denials, rationalizations, and explanations were either effectively rebutted by other evidence or incredible. When asked by this court whether he had sought any type of sensitivity training or counseling, Respondent made the unsubstantiated declaration that therapists had told him that therapy would not help with this type of misconduct.

The next factor—the judge's disciplinary record and reputation—cuts both ways in this case. In his favor, Respondent has no prior disciplinary record. But Respondent's reputation for employing what his Chief Judge called "off color or blue humor" extended beyond the females that he specifically harassed in this case. And most disconcerting, despite that widespread knowledge, Respondent's conduct went unchallenged for years.

Perhaps the most important factor for our consideration is the effect that Respondent's misconduct had upon the integrity and respect for the judiciary. The Preamble to the Kansas Code of Judicial Conduct explains why this factor is so important when it states: "Our legal system is based upon the principle that an independent, impartial, and competent judiciary, composed of men and women of integrity, will interpret and apply the law that governs our society." Supreme Court Rule 601B (2014 Kan. Ct. R. Annot. 751). The Preamble goes on to inform judges that they "must respect and honor the judicial office as a public trust and strive to maintain and enhance confidence in the legal system," and, in that regard, "[j]udges should maintain the dignity of judicial office at all times, and avoid both impropriety and the appearance of impropriety in their professional and personal lives." 2014 Kan. Ct. R. Annot. 752. Moreover, the Code was put in place to "assist judges in maintaining the highest standards of judicial and personal conduct." 2014 Kan. Ct. R. Annot. 752.

A judge who sexually harasses female attorneys and staff members, who uses his judicial office to harm the law practice of an attorney with whom the judge disagrees on moral issues, and who uses his judicial office for personal gain by trying to influence whether his wife is offered a job has fallen well short of those highest standards. Such improprieties are precisely the type of misconduct that can undermine the public's confidence in the judiciary.

The Respondent's conduct in making "repeated inappropriate and offensive comments" to female staff members and to female attorneys appearing in his court is particularly troubling. Even in the private sector, the law would not tolerate such a hostile work environment. See, *e.g.*, *Labra v. Mid-Plains Constr., Inc.*, 32 Kan. App. 2d 821, Syl. ¶ 8, 90 P.3d 954 (2004) ("Isolated incidents of conduct that may be offensive or boorish are not actionable as sexual harassment, but where the employee is the target of a persistent pattern of sexually provocative conduct that is intended to satisfy the supervisor's prurient desires in the workplace and beyond, such conduct is actionable in Kansas."). But we have set the bar higher for the courts, declaring that "[h]eightened sensitivity to respectful relationships in the Kansas judicial workplace is mandatory." *In re Alvord*, 252 Kan. 705, 709, 847 P.2d 1310 (1993).

Accordingly, we do not view public censure as the appropriate sanction in this case and a majority of the court hereby imposes an initial sanction of an unpaid, 90-day suspension, commencing within 10 days of the filing of this opinion. A minority would impose a more severe sanction.

In addition, because Respondent does not seem to appreciate why his conduct was unacceptable, we also impose an educational requirement. Within 1 year of this opinion's filing date, Respondent shall have satisfactorily completed a course in sexual harassment, discrimination, and retaliation prevention training, as well as educational program(s) on the employment law applicable to such conduct. Respondent shall file a report with this court within that 1-year period, detailing the training and program(s) completed.

Further, Respondent shall be prohibited from accepting any position in the Eighteenth Judicial District that involves the supervision of any judicial branch employee, other than his chambers staff, for a period of 2 years following completion of the above-described educational requirement.

21

If Respondent violates or fails to meet any of the conditions set forth in this opinion, such noncompliance shall be deemed a Code violation. See Canon 2, Rule 2.16 (2014 Kan. Ct. R. Annot. 772) (requiring cooperation with disciplinary authorities).

IT IS THEREFORE ORDERED that Respondent shall be suspended from his judicial duties for a period of 90 days without pay, commencing within 10 days of the filing of this opinion.

IT IS FURTHER ORDERED that Respondent shall, within 1 year of this opinion, satisfactorily complete a course in sexual harassment, discrimination, and retaliation prevention training and one or more educational programs on the employment law applicable to such conduct and shall file a report with this court within that 1-year period, detailing the training and program(s) completed.

IT IS FURTHER ORDERED that Respondent shall be prohibited from accepting any position in the Eighteenth Judicial District that involves the supervision of any judicial branch employee, other than his chambers staff, for a period of 2 years following completion of the above-described educational requirement.

IT IS FURTHER ORDERED that any violation of or failure to meet any of the conditions set forth in this opinion shall be deemed a violation of the Kansas Code of Judicial Conduct.

IT IS FURTHER ORDERED that this opinion shall be published in the official Kansas Reports and that the costs of this action shall be assessed to the Respondent.

LUCKERT and BILES, JJ., not participating.

JOSEPH L. MCCARVILLE, III, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** District Judge McCarville was appointed to hear case No. 112,056 vice Justice Luckert under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.