# IN THE SUPREME COURT OF IOWA

No. 138 / 06-1394

Filed January 19, 2007

**IOWA SUPREME COURT ATTORNEY
DISCIPLINARY BOARD,**

> Complainant,

vs.

**RODNEY H. POWELL,**

> Respondent.

---

On review of the report of the Grievance Commission.

Iowa Supreme Court Grievance Commission recommends a six-month suspension of respondent's license to practice law in this state. **LICENSE SUSPENDED.**

Charles L. Harrington and David J. Grace, Des Moines, for complainant.

Mark McCormick of Belin Lamson McCormick Zumbach Flynn, A Professional Corporation, Des Moines, for respondent.

**WIGGINS, Justice.**

On July 28, 2005, the Iowa Supreme Court Attorney Disciplinary Board filed a complaint against Rodney H. Powell with the Grievance Commission of the Iowa Supreme Court alleging Powell committed various violations of the Iowa Code of Professional Responsibility for Lawyers. The complaint contained three counts arising out of Powell's representation of three different clients. The Board amended the complaint to include a fourth count involving an additional client. The Commission found Powell's conduct violated numerous provisions of the Iowa Code of Professional Responsibility for Lawyers and recommended we suspend Powell's license to practice law with no possibility of reinstatement for a period of six months. The Commission also recommended as a condition of reinstatement that Powell release the liens he acquired in properties owned by one of his clients.

Because we agree with the Commission's finding that Powell's conduct violated numerous provisions of the Iowa Code of Professional Responsibility for Lawyers and its recommendations regarding Powell's sanction, we suspend Powell's license to practice law indefinitely with no possibility of reinstatement for a period of six months.

**I. Scope of Review.**

We review attorney disciplinary proceedings of the Commission de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Walker*, 712 N.W.2d 683, 684 (Iowa 2006). The Board must prove ethical violations by a convincing preponderance of the evidence. *Id.* "Although we consider the Commission's factual findings and discipline recommendations, they do not bind us." *Id.*

## II. Findings of Fact.

On our de novo review of the record, we make the following findings of fact. We admitted Powell to the Iowa bar in 1973. After graduation from law school, he entered the Air Force as a JAG officer. There he primarily prosecuted and defended courts-martial. Powell served as a JAG officer until 1977. During that period, Powell was admitted to practice in front of the Air Force courts, as well as the United States Court for Military Appeals.

In 1977 Powell separated from active duty and moved to St. Louis, Missouri. Powell began working for Missouri Legal Services and was admitted to the Missouri bar in 1978. Powell was a managing attorney for the St. Louis County Office for Legal Aid from 1980 to 1988. Powell held a supervisory position, overseeing the clinical program between legal services and Washington University in St. Louis School of Law, the family law department, and the volunteer lawyer program. In addition, Powell created an ecumenical legal assistance ministry that reached out to impoverished areas of St. Louis.

Powell left legal services in 1988 to return to Iowa. He entered the private practice of law as an associate with a Des Moines law firm. He eventually became a partner in the firm. The firm practiced primarily as a labor and employment law firm. Powell was hired to handle the firm's other caseload. For example, if a client had a family law problem, Powell would handle the case.

When the firm dissolved in 1996, Powell opened a solo practice in Norwalk. As his practice grew, Powell hired two additional attorneys to join his firm. The firm's practice is a general one; however, Powell has centered his practice on wills, probate, and real estate matters.

*A. Walton Matter.* In November 1991 Malissa Walton hired Powell to represent her in a dissolution of marriage. Walton's parents suggested she retain Powell. Powell and Walton's parents, the Hinshaws, knew each other from community activities. Mrs. Hinshaw called Powell and arranged for a meeting. She and her daughter saw Powell at the Des Moines law firm.

Although a fee arrangement was discussed, nothing was put in writing. It was understood by both Walton and Powell that Walton's mother, Mrs. Hinshaw, would pay for Powell's services. However, Powell sent every bill to Walton's address. Walton claims she only sometimes saw the billing statements. Mrs. Hinshaw paid Powell approximately $300 from 1991 until 1993. However, both Walton and Powell agree after Walton's father passed away in 1996, Mrs. Hinshaw no longer agreed to be responsible for Powell's fees.

The court finalized Walton's marriage dissolution in August 1992. Powell obtained a favorable outcome for Walton. The total legal fees generated for the dissolution amounted to $2850. Walton or her mother made small payments toward the bill, totaling a little over $350. Walton did not pay the balance of her bill. Powell knew from the dissolution, Walton had three young children, had over $10,000 in debt, and was living on a limited income.

On almost every billing cycle, Powell charged Walton a finance charge. From December 13, 1991, until February 17, 1995, Powell charged Walton an interest rate of 18 percent or 1.5 percent per month on any unpaid balance. Powell never informed Walton that he would charge her compound interest. The interest rate then increased to 22 percent or 1.83 percent per month. He never informed Walton that he had the right to raise the interest

rate. By March 31, 2003, Walton owed Powell $21,920.50. Of this, $18,691.27 was attributable to the finance charges.

Powell made several attempts to collect fees from Walton. From 1993 to 1996 Powell sent Walton several letters asking for any payment. In his first letter, Powell acknowledged Walton was on a very limited income, but still requested she make regular payments on her bill. He also stated if Walton made regular payments, he was willing to waive the finance charges for each month he received a payment.

In 1995 Powell notified Walton he would send her account to a collection agency if she did not start making payments on the bill. In 1996 Powell sent a letter to Walton encouraging her to work with him to "negotiate an arrangement which is acceptable to both [Walton] and [Powell]." After receiving phone calls from Powell's office, Walton did pay $10 toward her bill.

By May 1997 now some six years after Powell first represented Walton, the account remained open and Powell was still sending monthly bills, but no other exchanges occurred between Powell and Walton. In 2000 Powell once again attempted to collect payment from Walton. This time his efforts were more aggressive.

On February 28, 2001, Powell sent a letter stating, unless Walton paid $3250 he would report the discharged debt to the Internal Revenue Service (IRS) as income and she would be responsible for more than $5000 in taxes because of this discharge. Walton did not pay Powell the $3250. From February 2000 to February 2002 Powell's office made over 120 phone calls in an attempt to collect the debt from Walton.

On June 13, 2002, Powell sent Walton a right to cure notice stating $21,474.34 would be reported as a discharged debt to the IRS if some

acceptable payment was not received in twenty days. Walton did not pay Powell. On November 13, 2002, Powell wrote to Walton and informed her the debt was discharged and indicated he would be reporting the discharge as income to the IRS. The letter also included an IRS 1099-MISC form showing Walton had other income of $21,920.50.

Powell filed the 1099-MISC form with the IRS. Considering this discharge as other income, the IRS proposed Walton pay $2991 in taxes. However, after Walton provided further information to the IRS demonstrating she did not work for Powell, but rather that he discharged a debt, the IRS no longer required Walton to pay the taxes.

*B. Hutchins-Carroll Matter.* Sandra Hutchins and Marvin Carroll hired Powell in May 2000 for help in retrieving personal property Hutchins left at a home she just sold. Hutchins did not sign a written fee agreement when she retained Powell. Powell never advised Hutchins or Carroll that he would charge them finance charges. While Powell was investigating the property dispute, Hutchins hired him for another matter involving Hutchins' daughter.

Hutchins generally received Powell's bills on a monthly basis detailing her fees. In each bill, it stated, "the monthly finance charge will be at an ANNUAL PERCENTAGE RATE of 22% (1.83% per month)." Powell charged Hutchins a total of $2974 for the property matter and $4249 for the matter involving her daughter. The bill also reflected $1,655.66 in finance charges. These charges were offset by $858.50 in write-downs and payments of $1030. By March 2002 Hutchins owed Powell $8,028.29.

On two separate occasions, Hutchins wrote to Powell and complained about the finance charges. In her first letter, received by Powell on May 21, 2001, she stated, "you are charging a $100 a month finance charge. Now if

I'm making payments of $40 how could I possibly ever get this paid." In her second letter received by Powell on December 1, Hutchins again expressed her frustration at the finance charges.

Hutchins also met with Powell's staff to discuss the growing bill. Powell gave her various payment options. However, Hutchins did not enter into any payment agreement at that time. Because no payment agreement could be reached, Hutchins filed a complaint with the Board.

*C. Perkins Matter.* Robert Perkins operated Perkins Electric, an electrical contracting business. Powell represented Perkins primarily for matters relating to Perkins Electric from 1998 to 2003. During Powell's representation of Perkins, they never entered into a written fee agreement. Instead, Powell simply sent Perkins invoices detailing his charges. Perkins did not always pay his bill on time. Powell described Perkins as generally slow in paying his bills, but Powell attempted to be accommodating because of their ongoing relationship.

Over the period of time Powell represented Perkins, Powell charged Perkins $66,435 in fees, $1547 in costs, and $7,304.54 in finance charges. The finance charges included compound monthly interest at the rate of 1.83 percent or 22 percent per annum on all unpaid balances and a $15 late charge on any unpaid monthly balance. Perkins paid Powell $47,281.01.

Perkins and Powell spoke in November 2002 regarding several issues, including Perkins' concerns about the billing arrangements and the finance charges. Powell followed up on these earlier discussions with a letter, which in part discussed the finance charges. In his letter, Powell stated:

> You have also expressed concern at times relating to our interest charges. As I may have explained to you, we have great difficulty operating when we extend credit to clients. We are not in the lending business, and it is important that we be

paid every month for the work performed for our clients. Our hourly rates do not contain any padding for "carrying charges."

Perkins then wrote to Powell terminating their attorney-client relationship because of the finance charges. In his letter, Perkins stated, "[a]s I have tried to communicate to you on various occasions I will NOT agree to paying finance charges."

Powell responded to this letter and discussed the issues relating to the status of his legal representation, the billing invoice, the account history, the finance charges, and Perkins' files. In discussing the finance charges, Powell described the Perkins account as "commercial" and stated, "there is no requirement that there be any more writing to evidence the agreement to pay interest charges."

On January 28, 2004, Powell responded to a letter written by Perkins in which Perkins stated he considered his account with the Powell office to be paid in full and he would not be making any further payments on the account. In his response, Powell stated Perkins never questioned the accuracy of the invoices. Powell also contended the account was not paid in full. Further, Powell claimed if he discharged the unpaid balance in the account, the law required Powell to report the amount discharged to the IRS as income to Perkins. Unlike the Walton matter, where Powell made a similar statement, Powell did not file a 1099 form with the IRS.

In the letter, Powell also stated his office had a lien for unpaid fees against all papers and documents in Perkins' files. However, Powell never pursued enforcement of a lien. Finally, Powell offered to negotiate a settlement of the attorney's fees through binding arbitration, with the costs to be paid by the unsuccessful party. Perkins did not respond to this letter. Instead, Perkins filed a complaint with the Board.

Finally, Powell testified after this court made its decision in *Iowa Supreme Court Board of Professional Ethics & Conduct v. McKittrick*, 683 N.W.2d 554 (Iowa 2004), he "promptly recomputed the invoices from the beginning, and [he] gave [Perkins] a compound interest credit, taking off all compound interest amounts, so eventually converting it all to simple interest." So, on September 8, 2004, Powell sent a letter and invoice to Perkins stating he was crediting the Perkins account $1,961.30 for the compound interest charges.[1] Powell never discharged Perkins of his remaining debt.

*D. Jondall Matter.* In fall 2004 Amy Jondall hired Powell to represent her in her marriage dissolution. At the onset of the representation, Jondall received the firm's fee policy and agreement form. In part the agreement contained: (1) a provision acknowledging if Jondall's nonpayment of fees resulted in Powell discharging the fees, he would report the discharge as income to the IRS; (2) a provision stating if Jondall does not challenge a charge within ten days from receiving the invoice, she waives any claim to the accuracy of the bill or the sufficiency of the work done; and (3) a provision containing an indemnity clause stating any costs arising out of any complaint made by Jondall against Powell would be paid by Jondall if the complaint is resolved favorably to Powell. Jondall paid a portion of Powell's retainer in three installments.

Powell was responsible for drafting Jondall's consent decree of dissolution of marriage. After drafting the decree, Powell gave it to Jondall for her to look over. She approved the decree. Powell then sent the decree to opposing counsel for Mr. Jondall's signature.

---

[1] Powell also testified, in light of *McKittrick*, he made an appropriate credit to all of his active accounts where he charged compound interest.

Paragraph twenty-two of the decree contained a clause stating, "all said attorneys' fees shall constitute a judgment herein." Powell never explained to Jondall that this clause would create a lien on her property if her attorney's fees were not paid. Neither Mr. Jondall's attorney nor the judge, who signed the decree, raised any issue about paragraph twenty-two. The court filed the decree on January 31, 2005.

At the time of the dissolution action, Jondall and her soon-to-be ex-husband owned a home and an acreage. They planned to sell the home and the acreage. During the pendency of the dissolution proceeding, the Jondalls sold the acreage. The dissolution decree divided the proceeds from the acreage sale, awarding Jondall $20,000 of the proceeds, and her former husband $5000 of the proceeds.

On January 20, 2005, the buyer's attorney prepared a title opinion concerning the sale of the acreage. The title opinion did not note the judgment for attorneys' fees because the decree was not filed until January 31. The sale of the acreage closed on or about February 10. The buyer's mortgage company distributed the settlement funds without requiring an updated title opinion. The Jondalls delivered a warranty deed to the buyer.

At the time the sale of the acreage closed, Jondall had not made any payments to Powell, other than the three initial payments used to retain Powell. The highest invoice in the record shows Jondall owed Powell $7,855.29 in fees. On April 8 Powell's office contacted Jondall concerning the nonpayment of her bill. Jondall complained the fees were excessive.

After learning the Jondalls sold the acreage and the mortgage company disbursed funds to Jondall, Powell sent Jondall a letter requesting payment of his fees. The letter reaffirmed the existence of Powell's lien in

the property.  The letter also requested that she pay her fees so Powell would not have to take action against the buyer.

After receiving this letter and speaking with the staff at the Powell Law Firm, Jondall took her home off the market because with the attorney's lien on the property she felt there was not any way she could give a clean title to a buyer.  Jondall filed a complaint with the Board and requested Powell release the judgment liens on her properties.  As of September 6, 2006, Powell still had not released the liens.

### III.  Violations.

We have previously discussed the pitfalls an attorney faces when involved in a fee dispute with a client.  *McKittrick*, 683 N.W.2d at 559-60.  There we said,

> Attorneys should avoid fee disputes with clients as much as possible because the collection of fees by attorneys from clients can give rise to a host of problems and pitfalls. Attorneys should aspire to resolve fee disputes amicably, and sue clients only when necessary "to prevent fraud or gross imposition by the client."

> While it is not unethical for a lawyer to engage in fee collection practices against a former client, the practices employed to enforce collection should be carefully scrutinized. Illegal, aggressive, and improper collection practices can lead to disciplinary actions against attorneys, as can the use of attorney liens and confessions of judgment. Additionally, an attorney who imposes an unlawful finance charge and improperly calculates the amount of interest on a fee can violate the rules of professional ethics.

*Id.* (internal citations omitted).  Based on our review of the record, we find the Board met its burden and proved Powell violated numerous rules of the Iowa Code of Professional Responsibility for Lawyers when he utilized the following practices in charging and collecting his fees.

*A.  Finance Charges.*  An attorney cannot assess finance charges when the attorney collects a fee, unless the client agrees in writing in

advance to the finance charges imposed. *Id.* at 561. Additionally, where the legislature authorizes a finance charge, the legislature does not allow compounding of the finance charge. Iowa Code § 535.11(6) (1991). In the Walton, Hutchins-Carroll, and Perkins matters, Powell charged interest without first entering into a written fee agreement that would allow him to do so. He also compounded the finance charges.

By charging illegal finance charges, Walton's $2850 legal service bill became a $21,920.50 bill. Powell charged Hutchins $1655.66 in finance charges for $7223 in legal services. Further, Powell charged Perkins $7,304.54 in finance charges for $66,435.50 in legal services. These fees are clearly excessive.

Accordingly, Powell's conduct in charging illegal finance charges resulting in excessive fees violated DR 1-102(A)(6) (stating "[a] lawyer shall not [e]ngage in any other conduct that adversely reflects on the fitness to practice law") and DR 2-106(A) (stating "[a] lawyer shall not [e]nter into an agreement for, charge, or collect an illegal or clearly excessive fee").

*B. Reporting Clients' Discharged Debts to the IRS.* Powell contends he relied on the advice of his accountant and his reading of the tax law before he reported Walton to the IRS, threatened to report Perkins to the IRS, and included a paragraph in the Jondall fee agreement requiring her to acknowledge that if her nonpayment of fees resulted in Powell discharging the fees, he would report the discharge of the fees as income to the IRS. We agree with the Commission that Powell's testimony in this regard is not credible. Powell presented no evidence other than his statement that his accountant advised him this conduct was legal.

Under the United States Code, only "applicable entities" are required to report the discharge of a debt. 26 U.S.C. § 6050P(a) (1999). The only definition of an applicable entity that could apply to Powell is an

organization whose significant trade or business is in the lending of money. *Id.* § 6050P(c)(2)(D). Powell acknowledged he was not in the business of lending money. Therefore, Powell misrepresented the requirements of the tax code when he threatened to report his clients if he discharged their debt for legal services and when he reported the discharge of Walton's legal fees as income to the IRS.

Powell's conduct in threatening to report Perkins and Jondall to the IRS if he discharged their debts and in reporting Walton to the IRS is conduct involving misrepresentation and adversely reflects on Powell's fitness to practice law. *See Walker,* 712 N.W.2d at 685 (finding DR 1-102(A)(4), DR 1-102(A)(6), and DR 7-101(A)(3) are violated when an attorney misrepresents his compliance with the state and federal tax laws to his client); *Office of Disciplinary Counsel v. Kissel,* 442 A.2d 217, 220 (Pa. 1982) (finding the "use of intimidation in an effort to collect [a] disputed bill" for services is a violation of the ethics rules, including DR 1-102(A)(4), DR 1-102(A)(6), and DR 7-101(A)(3)). Additionally, by reporting Walton to the IRS, Powell intentionally damaged a client during the course of his professional relationship.

Accordingly, Powell's conduct in threatening to report and reporting his clients to the IRS violated DR 1-102(A)(4) (stating "[a] lawyer shall not [e]ngage in conduct involving, dishonesty, fraud, deceit, or misrepresentation"), DR 1-102(A)(6), and DR 7-101(A)(3) (stating "[a] lawyer shall not intentionally [p]rejudice or damage a client during the course of the professional relationship").

*C. Using a Judgment Lien for his Attorney's Fees.* Our rules provide an attorney may "[a]cquire a lien granted by law to secure a fee." Iowa Code of Prof'l Responsibility DR 5-103(A)(1). This rule only applies to liens " 'granted by law.' " *McKittrick,* 683 N.W.2d at 561 (citation omitted). Iowa

Code section 602.10116 governs liens an attorney may impose for unpaid fees. Iowa Code § 602.10116. Although section 602.10116 authorizes placing an attorney's lien on a judgment, it does not authorize the lien to attach to real property that was the subject of the litigation. *McKittrick*, 683 N.W.2d at 561-62. One rationale for not allowing the lien to attach to the real property is that a lien based on unliquidated and unadjudicated claims results in a form of economic coercion when the attorney attempts to enforce the lien to collect the attorney's fees. *Id.* at 562.

By placing the unauthorized lien on Jondall's property, Powell obtained a proprietary interest in the subject matter of the dissolution litigation he was conducting for Jondall. *See People v. Smith*, 830 P.2d 1003, 1005 (Colo. 1992) (finding "[the attorney's] recordation and subsequent failure to release the lien violated . . . DR 5-103(A)(1)"). Powell also engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation by placing the lien on the property without first disclosing this fact to Jondall. Additionally, this conduct is prejudicial to the administration of justice and adversely reflects on his fitness to practice law. *McKittrick,* 683 N.W.2d at 562. Moreover, the unauthorized lien on Jondall's property intentionally prejudiced and damaged Jondall during the course of their professional relationship. Jondall was unable to give clear title on the acreage to her buyer and was forced to remove her home from the market because of the lien.

Accordingly, Powell's conduct in placing the lien in the dissolution decree on property his client was awarded under the decree violated DR 1-102(A)(4), DR 1-102(A)(5) (stating "[a] lawyer shall not [e]ngage in conduct that is prejudicial to the administration of justice"), DR 1-102(A)(6), DR 5-103(A) (stating "[a] lawyer shall not acquire a proprietary interest in the

cause of action or subject matter of litigation being conducted for a client," except in a few limited circumstances) and DR 7-101(A)(3).

*D. Fee Agreement Provisions.* Jondall's fee agreement contained the following provisions:

9. MONTHLY INVOICE.

. . .

If you have any questions concerning the monthly invoice, you agree to contact the finance manager for The POWELL LAW FIRM, P.C. within ten (10) days of the date of the invoice. If you do not contact the finance manager within ten (10) days, you will be deemed to have agreed that the invoice is accurate and valid, and to have waived any claims as to the accuracy or sufficiency of the work performed on your behalf.

. . .

15. COLLECTION EXPENSES.

You agree to pay all expenses and attorney's fees, including those of The Powell Law Firm, P.C. proceeding pro se, relating to collection of amounts due under this agreement. Such collection shall include any and all judicial proceedings, arbitrations, and mediations as may be necessary to enforce or defend payment of amounts due hereunder. Said collection expenses shall also include any and all attorneys fees and expenses relating to the defense by The Powell Law Firm, P.C., of any complaints caused by client relating to the services performed by The Powell Law Firm, P.C. before any agency, department, court or branch of any government, or any bar association which renders a decision favorable to The Powell Law Firm, P.C.

The Iowa Code of Professional Responsibility for Lawyers prohibits a lawyer from limiting the attorney's liability to a client for legal negligence. Iowa Code of Prof'l Responsibility DR 6-102(A). The reason for the rule is that

[a] lawyer who handles the affairs of a client properly has no need to attempt to limit liability for professional activities and one who does not handle the affairs of a client properly should not be permitted to do so.

Iowa Code of Prof'l Responsibility EC 6-6. DR 6-102(A) applies to any agreement that would limit an attorney's future liability. *See Comm. on Prof'l Ethics & Conduct v. Hall*, 463 N.W.2d 30, 36 (Iowa 1990) (holding an agreement containing a provision releasing the attorney and his law firm from any and all claims the client might pursue in the future against the attorney or his law firm violated DR 6-102(A)). Both provisions included in Jondall's fee agreement attempted to limit Powell's liability for future legal negligence.

The ten-day provision substantially limits the time in which a client can bring a legal negligence action against Powell. We have found, normally, when the relationship between the attorney and the client is " 'founded on unwritten contracts' " or if it is an action " 'brought for injuries to property,' " Iowa Code section 614.1(4) governs the statute of limitations for legal negligence claims. *Venard v. Winter*, 524 N.W.2d 163, 166 (Iowa 1994) (citation omitted); *see also* Iowa Code § 614.1(4) (setting the statute of limitations at five years). Additionally, the discovery rule applies to statute of limitations questions in legal negligence actions. *Millwright v. Romer*, 322 N.W.2d 30, 32-33 (Iowa 1982). Our rules do not allow Powell to limit his future liability by reducing the time within which his clients can file a legal negligence claim against him.

The indemnity provision contained in the contract also limits a client's ability to bring an action by exposing the client to a substantial financial burden if a client brings a legal negligence claim and loses. The law in this jurisdiction is well settled; unless authorized by statute or contract, a court does not have the inherent power to include the expenses of litigation and attorney's fees in a damage award. *Harris v. Short*, 253 Iowa 1206, 1208-09, 115 N.W.2d 865, 866-67 (1962). One of the reasons

for the rule is that "[people] might be unjustly discouraged from instituting an action to vindicate their rights if the penalty for losing included the fees of their opponents' counsel." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718, 87 S. Ct. 1404, 1407, 18 L. Ed. 2d 475, 478 (1967). By shifting the burden of litigation costs and attorney's fees to his clients, Powell limited his future liability to only those clients who can afford to bear these costs if they bring suit and lose.

Accordingly, Powell's conduct in placing provisions in his attorney fee contract requiring a client to contest the sufficiency of his work within ten days and providing him indemnity when a client loses a legal negligence claim the client might bring because of his representation violated DR 1-102(A)(5), DR 1-102(A)(6), DR 2-106(A), and DR 6-102(A) (stating "[a] lawyer shall not attempt to be exonerated from or limit liability to a client for personal malpractice").

## IV. Sanction.

In determining the sanction a lawyer must face as a result of his or her misconduct, we have stated:

> "The goal of the Code of Professional Responsibility is 'to maintain public confidence in the legal profession as well as to provide a policing mechanism for poor lawyering.' When deciding on an appropriate sanction for an attorney's misconduct, we consider 'the nature of the violations, protection of the public, deterrence of similar misconduct by others, the lawyer's fitness to practice, and [the court's] duty to uphold the integrity of the profession in the eyes of the public.' We also consider aggravating and mitigating circumstances present in the disciplinary action."

*Iowa Supreme. Ct. Att'y Disciplinary Bd. v. Iversen,* 723 N.W.2d 806, 810 (Iowa 2006) (citation omitted) (alterations in original).

Powell's conduct in causing actual harm to his clients is an aggravating factor. In the Walton matter, he harmed his client by filing the

1099 form with the IRS. In the Jondall matter, he harmed his client by attaching a lien to her real property in the dissolution decree. Another aggravating factor to consider is that Powell's conduct was not an isolated incident. Powell admitted to sending ten to fifteen 1099 forms to other clients. He also admitted he obtained the same type of judgment lien as he used in the Jondall matter with an additional ten to fifteen clients.

Powell's lack of prior disciplinary violations is a mitigating factor. Additionally, the affidavits filed on his behalf indicate he is a highly respected member of the bar and the community. Another mitigating factor is that none of his clients complained about the quality of his representation. The complaints only concerned the manner in which he billed and collected his fees.

We have previously suspended an attorney's license for three months for compounding interest, imposing an unauthorized lien on her client's property for her attorney's fees, and neglecting a client's case leading to potential prejudice to a client. *McKittrick*, 683 N.W.2d at 563-64. Although Powell's conduct did not involve neglect, Powell's violations are more serious than McKittrick's because of the deceit involved when he did not disclose to Jondall the lien he inserted in her dissolution decree and the intimidation he used by threatening to file the 1099 forms. Another difference between McKittrick's conduct and Powell's conduct is that Powell directed his actions against multiple clients, while McKittrick's conduct only involved one client.

Considering the nature of the violations, the protection of the public, deterrence of similar misconduct by others, Powell's fitness to practice, our duty to uphold the integrity of the profession in the eyes of the public, aggravating circumstances, mitigating circumstances, and the sanction we

have given in a similar case, we agree with the Commission that the appropriate sanction for Powell's conduct is a six-month suspension of his license to practice law.

## V. Disposition.

In light of the above facts and circumstances surrounding Powell's conduct, we suspend Powell's license to practice law in this state indefinitely with no possibility of reinstatement for six months. Upon any application for reinstatement, Powell must establish he has not practiced law during the suspension period and he has complied in all ways with the requirements of Iowa Court Rule 35.13. Powell also must comply with the notification requirements of Iowa Court Rule 35.21. Additionally, Powell must provide satisfactory evidence that he released the liens he acquired against Jondall's real property. Finally, we tax the costs of this action against Powell pursuant to Iowa Court Rule 35.25.

**LICENSE SUSPENDED.**