# IN THE SUPREME COURT OF IOWA

No. 19–1438

Filed June 19, 2020

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Appellee,

vs.

**ABRAHAM K. WATKINS,**

Appellant.

On appeal from the report of the Iowa Supreme Court Grievance Commission.

The grievance commission recommends the suspension of an attorney's license for thirty days based on the attorney's sexual harassment. **LICENSE SUSPENDED.**

Alfredo Parrish and Gina Messamer of the Parrish Law Firm, Des Moines, for appellant.

Tara van Brederode and Amanda K. Robinson (until withdrawal) and Allison A. Schmidt, Des Moines, for appellee.

**CHRISTENSEN, Chief Justice.**

This case involves an Iowa attorney who was nearly removed from elected office as the Van Buren county attorney because of his sexual harassment. A district court judge ordered him removed. This court reversed the district court because of the high legal burden for removal under Iowa Code section 66.1A. Subsequently, the Iowa Supreme Court Attorney Disciplinary Board (Board) charged the attorney with a violation of Iowa Rule of Professional Conduct 32:8.4(g), which prohibits an attorney from engaging in sexual harassment, and recommended a six-month suspension. The parties reached a factual stipulation, agreeing that the charged violation occurred. The Iowa Supreme Court Grievance Commission (commission) recommended the attorney's license be suspended for thirty days.

The attorney challenges the commission's recommended sanction and requests a public reprimand instead. Upon our de novo review, we conclude that the attorney violated rule 32:8.4(g). We disagree with the commission's recommended sanction of thirty days and suspend the attorney's license to practice law for an indefinite period with no possibility of reinstatement for six months from the filing of this opinion.

## I. Factual and Procedural Background.

Abraham Watkins graduated from law school in 2004. He was not a licensed attorney and primarily supported himself by playing poker until he and his wife, Renee, decided to move to Iowa in 2012. Watkins was sworn into the Iowa bar in May 2013 and began practicing law for the first time when he opened a solo practice in Keosauqua, Iowa. Watkins operated this practice out of an office located on the main level of his two-story family home with the assistance of Renee, who served as his office

manager. In September 2014, Watkins hired Jane Doe,[1] who was then twenty years old, as a legal assistant. Two months later, Watkins was elected as the Van Buren county attorney, and he assumed office on January 1, 2015.

The Van Buren county attorney is a part-time position. Thus, Watkins split his time between his work as the Van Buren county attorney and his private law office, operating both out of his home. Renee and Doe also began splitting their time between the county attorney's office and Watkins's private law office. As Doe's work expanded, she began working longer hours and performing personal tasks for Watkins such as picking up his medical prescriptions, ordering and retrieving his lunch, and babysitting his children. Doe would also socialize with the Watkins family, occasionally eating dinner with them and taking trips with them.

In April 2015, Watkins hired a female part-time assistant county attorney (ACA). Watkins, Renee, Doe, and the ACA all continued to work out of the main level of Watkins's family home with the approval of the county board of supervisors. During this time, Watkins consumed alcohol heavily outside of the workplace. Tensions continued to escalate in the office between staff members, especially as Watkins and the ACA disagreed on work matters and Renee grew tired of Watkins's drinking habits. Watkins would frequently argue with the ACA and Renee in the office.

In August 2016, Renee left with their children to visit her family in North Carolina because she was frustrated with Watkins's drinking habits. Watkins took this as a sign that he needed help and was later hospitalized for his alcohol abuse. He later contacted Hugh Grady from the Iowa Lawyers Assistance Program, who recommended various steps for Watkins

---

[1]We do not refer to Watkins's victims by name out of respect for their privacy and a desire to preserve their anonymity.

to take to address his alcohol abuse.  Watkins took these steps and has maintained his sobriety since August 2016.

On August 9, approximately two years after she began working for Watkins, Doe submitted a letter of resignation to Watkins, resigning from all of her responsibilities as his legal assistant.  She stated in her letter, "I have learned many things in my time here, including what makes a hostile work environment."  She also wrote, "Due to aberrant behavior and a hostile work environment, I no longer can continue my position and feel confident about coming into work."

Additionally, Doe prepared a list of complaints regarding Watkins that totaled approximately fifty-five examples over her two years of working with Watkins.  Many of these complaints involved her frustration with the menial work tasks Watkins gave her and the way he made her feel inferior to him.  These complaints included "criticizing me in front of customers," "constant yelling between him [and] Renee," "the importance of him [and] not us," and "[he] very often expected me to figure [work] out then remind me I didn't go to law school."

Several of the complaints involved the sexual-harassment allegations at issue in this case.  Watkins appeared before Doe on at least two occasions wearing only his boxer briefs.  He told Doe that "he just wished he had a wife that had sex with him all the time," and he was glad he kept naked pictures of his former girlfriends.  Watkins made a sexually driven "joke" about a floor cleaner called "Bona" in the presence of Doe and the women who were cleaning his office.

In reference to a female client, Watkins told Doe, "Man, I wouldn't want to see her naked."  In discussing a courthouse employee, Watkins told Doe that he needed to see if she "wore a padded bra or if her boobs were really that big."  He referred to a local attorney as "T.Queef," which is

a term that describes the emission of air from the vagina. Moreover, Watkins told Doe that her "boobs [were] distracting him" and that she should wear that same shirt if she "ever went clubbing." He also asked Doe on multiple occasions if "her vagina was still broke" after she missed work for a gynecology appointment.

Watkins also showed Doe and the ACA private images of his wife. Specifically, he showed Doe a picture on his cell phone of his wife's vagina. He also showed her a video of his wife squirting breast milk in the back seat of Doe's vehicle. Watkins kept nude photographs of his wife on his computer, and he showed the ACA one of these photos in which his wife was pregnant, nude, and covered in blue paint.

The ACA forwarded Doe's letter of resignation to the Van Buren county auditor, who then notified the Van Buren County Board of Supervisors. Following the board of supervisor's investigation and two closed sessions to discuss the allegations and how to handle them, the board filed a petition in district court seeking to remove Watkins from office pursuant to Iowa Code sections 66.11 and 331.754(4) (2015). The removal petition cited five separate grounds, including one ground that he created a "hostile work environment" that involved sexual harassment.[2]

The district court issued its ruling on January 3, 2017, following a trial that occurred intermittently over the course of several months. The district court ordered Watkins's removal from the Office of Van Buren County Attorney based solely upon the sexual-harassment claim, crediting the testimony of Doe and the ACA, in addition to the testimony of other

---

[2]In addition to the sexual harassment allegation, the petition alleged that Watkins supplied a minor with alcohol in violation of Iowa Code sections 123.47(1) and 123.47(2)(*a*), engaged in retaliation, accepted three private-practice cases that created a conflict of interest with his position as county attorney, and had been intoxicated in violation of Iowa Code section 66.1A(6). The district court's removal ruling was based solely on the sexual-harassment ground in the petition.

witnesses who heard Watkins make inappropriate statements of a sexual nature and whom Watkins offered to show naked pictures of his wife.

The district court concluded Watkins engaged in misconduct or maladministration by regularly committing sexual harassment. It also determined that this misconduct was willful. The district court reasoned,

> Mr. Watkins's inappropriate conduct was pervasive and existed over a significant period of time thereby negating any claim of mistake or an isolated lapse of judgment. His actions were clearly intentional. As a lawyer he knew better but continued to subject his two young female employees to sexually related banter, and in some instances images, that have no place in the work setting. This is especially true for a county attorney's office. Given the extent and stunning nature of his conduct one can, and in the Court's opinion must, infer that he was acting with a bad or evil purpose. Therefore, the State has established that his conduct was willful.

Watkins appealed the decision, and our court retained the appeal. In a 4–3 decision with no majority opinion, our court reversed the district court's removal decision due to the high burden required to remove an elected official from office. *See State v. Watkins*, 914 N.W.2d 827, 847 (Iowa 2018) (plurality opinion); *id.* at 848 (Appel, J., concurring specially). Consequently, Watkins was restored to the part-time position of Van Buren county attorney. The voters of Van Buren County did not reelect him to the position in 2018. Watkins maintains his private law office in Keosauqua, although he lives in Des Moines and commutes to Keosauqua as necessary.

The Iowa Supreme Court Attorney Disciplinary Board filed a complaint against Watkins on December 18, 2018. The Board's complaint alleged Watkins violated Iowa Rule of Professional Conduct 32:8.4(g) by engaging in sexual harassment in the practice of law based on the incidents at issue in Watkins's removal action. The parties entered into a

stipulation of facts and agreed to the rule violation. They also stipulated to the admission of an expanded record, including transcripts of testimony offered in the removal proceeding.

The commission issued its findings and recommendation on August 30, 2019, in which it found the violation of rule 32:8.4(g) was factually supported. The commission recommended that we suspend Watkins's license for thirty days. In doing so, the commission found the following mitigating factors: Watkins's lack of prior disciplinary action, his cooperation with the disciplinary process, the steps he took to address his alcoholism, and the counseling efforts he engaged in aimed at addressing the behaviors underlying his ethical violation. The commission also found aggravating factors existed in that Watkins's behavior was not confined to an isolated incident, his harassment took place at the victims' place of work under Watkins's supervision, some of Watkins's harassment took place while he was the Van Buren county attorney, and there was a power imbalance between Watkins and Doe. On appeal, Watkins requests a public reprimand in lieu of a suspension, while the Board recommends a six-month suspension.

## II. Standard of Review.

We generally review attorney disciplinary proceedings de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Stansberry*, 922 N.W.2d 591, 593 (Iowa 2019). The Board must prove any alleged misconduct by a convincing preponderance of the evidence, which "is less than proof beyond a reasonable doubt, but more than the preponderance standard required in a civil case." *Id.* "[T]he parties are bound by the stipulated facts, 'which we interpret with reference to their subject matter and in light of the surrounding circumstances and the whole record.' " *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Nine*, 920 N.W.2d 825, 828 (Iowa 2018) (quoting

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Johnson*, 884 N.W.2d 772, 777 (Iowa 2016)). However, "we are not bound by the attorney's stipulation to an ethical violation or the commission's recommended sanction." *Id.*

### III. Ethical Violation.

Iowa Rule of Professional Conduct 32:8.4(g) establishes that it is professional misconduct for an attorney to "engage in sexual harassment or other unlawful discrimination in the practice of law." Iowa R. Prof'l Conduct 32:8.4(g). We define "sexual harassment" broadly, and it "encompasses 'any physical or verbal act of a sexual nature that has no legitimate place in a legal setting.' " *Stansberry*, 922 N.W.2d at 597 (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Moothart*, 860 N.W.2d 598, 604 (Iowa 2015)). We do not require the sexually harassing conduct to be unwelcome or "more than an occasional stray comment." *Moothart*, 860 N.W.2d at 604. An attorney may violate this rule "even if there is no attorney–client relationship between the lawyer and the person subject to sexual harassment, as long as the attorney is engaged in the practice of law." *Id.* at 603. This includes the sexual harassment of "witnesses, court personnel, law partners, law-office employees, or other third parties that come into contact with a lawyer engaged in the practice of law." *Id.*

Our past attorney disciplinary cases regarding sexual harassment have generally involved attorneys who engage in behaviors that could be considered "come-ons"—conduct like making sexual advances, requesting sexual favors, or engaging in other acts of an overtly sexual nature. *See, e.g., id.* at 602–04. Nevertheless, sexual harassment also encompasses what could be considered "put downs," in the form of gender harassment that is aimed at degrading or demeaning women, often to maintain gender hierarchy. Louise F. Fitzgerald & Lilia M. Cortina, *Sexual Harassment in Work Organizations: A View From the Twenty-First Century, in* 1 *APA*

*Handbook of Psychology of Women* 6–7 (Cheryl B. Travis & Jacquelyn W. White, eds., 2018) [hereinafter Fitzgerald & Cortina]; *see* Brian Soucek & Vicki Schultz, *Sexual Harassment by Any Other Name*, 2019 U. Chi. Legal F. 227, 231–33 [hereinafter Soucek & Schultz].

The " '[g]arden variety' gender harassment . . . includes 'woman bashing' jokes, insults about [women's] incompetence, the irrelevance or sexual unattractiveness of older women, and comments that women have no place in certain kinds of jobs." Fitzgerald & Cortina at 7. In a "more pernicious form," it includes "referring to women by degraded names for body parts, pornographic images, [and] crude comments about female sexuality or sexual activity." *Id.* This discrimination does not require an individual woman to serve as its target or unwanted sexual overtures, nor does it need to be explicitly linked to any job or consideration. *Id.* at 7–8, 26.

Watkins's behavior in this case virtually ran the whole gamut of the actions mentioned above. For example, Watkins made a sexually driven "joke" about a floor cleaner called "Bona" in the presence of Doe and the women who were cleaning his office. In reference to a female client, Watkins told Doe, "Man, I wouldn't want to see her naked." On another occasion, he told Doe that he needed to see if a certain courthouse employee "wore a padded bra or if her boobs were really that big." He referred to a local female attorney as "T.Queef," which is a term that describes the emission of air from the vagina.

Moreover, he told Doe that her "boobs [were] distracting him" and that she should wear that same shirt if she "ever went clubbing." Watkins also asked Doe on multiple occasions if "her vagina was still broke" after she missed work once for a gynecology appointment. Further, Watkins told Doe that "he just wished he had a wife that had sex with him all the

time" and that he was glad he collected and kept naked pictures of his former girlfriends.

Watkins showed Doe a picture on his cell phone of his wife's vagina. On another occasion, Watkins showed Doe a video of his wife squirting breast milk in the back seat of Doe's vehicle. Watkins also kept naked photographs of his wife on his computer, and he showed the ACA one of these photos in which his wife was pregnant, nude, and covered in blue paint. Additionally, Watkins appeared before Doe wearing only his boxer briefs on at least two occasions. Based on these facts, we agree with the commission that Watkins violated rule 32:8.4(g).

**IV. Sanction.**

Having concluded Watkins violated rule 32:8.4(g), we must now determine the appropriate sanction for his unethical conduct. The commission recommended a thirty-day suspension. On appeal, the Board recommends a six-month suspension, while Watkins requests a public reprimand in lieu of any suspension.

In determining the proper sanction for a violation of our rules of professional conduct, we examine "the nature of the violations, protection of the public, deterrence of similar misconduct by others, the lawyer's fitness to practice, and [our] *duty to uphold the integrity of the profession in the eyes of the public*." *Stansberry*, 922 N.W.2d at 598 (emphasis added) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Powell*, 726 N.W.2d 397, 408 (Iowa 2007)). "We also consider any aggravating or mitigating circumstances." *Id.* As Watkins notes, his case differs from past sexual-harassment cases because "this is the first 'sexual harassment' disciplinary case before the Court that does *not* involve an attorney propositioning a client, touching a client, or taking some other inappropriate action for the attorney's own sexual gratification." Thus,

our prior disciplinary cases involving sexual harassment may be instructive, but their relevance is diminished. *Cf. Iowa Supreme Ct. Att'y Disciplinary Bd. v. Carpenter*, 781 N.W.2d 263, 270 (Iowa 2010) ("There is no standard sanction for a particular type of misconduct, and though prior cases can be instructive, we ultimately determine an appropriate sanction based on the particular circumstances of each case.").

Our duty to uphold the integrity of the legal profession extends to all forms of sexual harassment as expressly prohibited in rule 32:8.4(g). Sexual harassment in any form can have devastating effects for the women who experience it. In the legal profession, surveys reveal a gender-harassment problem in law firms so serious that "nine in ten harassment victims [at law firms] had experienced sex-based or gender harassment" that did not involve sexual advances. Soucek & Schultz at 235. In a 2018 survey of 3000 businesses and law firms, sixty-eight percent of the female respondents reported experiencing sexual harassment. Hannah Hayes, *Is Time Really Up for Sexual Harassment in the Workplace? Companies and Law Firms Respond*, 26 Perspectives, Dec.–Jan. 2019, at 3, 3.

The effects of this type of sexual harassment have long been recognized. *See* Catharine A. MacKinnon, *Sexual Harassment of Working Women* 47, 51 (1979) [hereinafter MacKinnon] (Sexual harassment leaves women "feel[ing] humiliated, degraded, ashamed, embarrassed, and cheap, as well as angry" and often "totally shatter[s]" a woman's confidence in her job performance.). Yet, when "[f]aced with the spectre of unemployment, discrimination in the job market, and a good possibility of repeated incidents elsewhere, women usually try to endure" the harassment. *Id.* at 52; *see also* Chai R. Feldblum & Victoria A. Lipnic, U.S. Equal Emp't Opportunity Comm'n, *Select Task Force on the Study of Harassment in the Workplace* (June 2016), https://www.eeoc.gov/select-

task-force-study-harassment-workplace [https://perma.cc/4XYG-B265] ("The least common response to harassment is to take some formal action – either to report the harassment internally or file a formal legal complaint."). That Watkins's conduct did not involve the type of self-gratifying sexual harassment involved in our prior cases does not lessen its gravity.

Some states have imposed severe sanctions for similar behavior. For example, the Ohio Supreme Court suspended an attorney's license to practice law in Ohio for one year for behavior similar to Watkins's with the final six months of the suspension stayed on the condition that he engage in no further misconduct. *Disciplinary Counsel v. Skolnick*, 104 N.E.3d 775, 778 (Ohio 2018). There, the attorney verbally harassed his paralegal for more than two years by calling her names, insulting her appearance, making fun of her husband and her mother, criticizing her education level in front of other attorneys, falsely telling an African-American client that the paralegal did not like black people, and remarking that she and another female employee should perform a sexual gesture on him so he could rate their performances. *Id.* at 776.

Similarly, the Colorado Supreme Court suspended an attorney's license for one year and one day for inflicting "vulgar, degrading non-consensual sexually abusive conduct" on his employees. *People v. Lowery*, 894 P.2d 758, 758, 761 (Colo. 1995) (en banc) (per curiam). While the attorney in that case also engaged in other acts of sexual misconduct, such as kissing employees, the Colorado Supreme Court found the attorney's verbal abuse of the women just as problematic as the nonconsensual physical contact. *Id.* at 760–61.

The Kansas Supreme Court suspended a judge for ninety days who had a history of making highly inappropriate, sexually suggestive

comments to women with whom he worked. *In re Henderson*, 343 P.3d 518, 520–21, 529 (Kan. 2015) (per curiam). These included telling a female prosecutor that when his wife gave birth, the doctor asked if he wanted an extra stitch in his wife for his pleasure; talking about sexual tension between this prosecutor and a witness in a trial; stating that another female prosecutor liked to have sex; inquiring whether this prosecutor was pregnant after returning from vacation; and commenting that his female court reporter's back hurt because she had been with her boyfriend all weekend. *Id.* at 520–22. While there was other misconduct, including an improper ex parte communication to have a disfavored attorney removed from an appointment list, *id.* at 524, the harassment bears resemblance to that in the present case. These cases support a significant sanction for Watkins's conduct.

While the parties stipulated to the facts regarding the aggravating and mitigating circumstances, we are not bound by their stipulations of law. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Lynch*, 901 N.W.2d 501, 511 n.5 (Iowa 2017). Upon de novo review, our aggravating and mitigating factors do not mirror the commission's factors. In fact, there are several aggravating factors in this case that support the Board's requested six-month suspension.

**A. Aggravating Factors.** We note the following aggravating factors: (1) Watkins's failure to accept responsibility and his continuous downplaying of his behavior, (2) Watkins's claimed ignorance that his behavior was inappropriate, (3) Watkins's position as the elected county attorney, (4) the power imbalance between Watkins and Doe, and (5) the harm caused to Doe.

1. *Watkins's failure to accept responsibility.* While Watkins claims he has accepted responsibility for his sexual harassment and has worked

to address the issue that caused the mentality behind his gender discrimination, his public apology and characterization of his behavior in this case suggest otherwise. *See Stansberry*, 922 N.W.2d at 600 (holding it was an aggravating factor that the attorney accused of misconduct "minimized his crimes, placed blame elsewhere, and failed to acknowledge his wrongdoing"). Notably, in his public apology, he merely referred to his behavior as "careless." An example of being careless is when you forget to turn off the coffee pot before leaving work. Watkins's behavior cannot be classified as careless.

In this case, Watkins tries to downplay his harassing conduct by arguing that most of his conduct at issue "consisted of one-off comments, most of which were intended to be humorous," and "[t]here must be some tolerance for tasteless jokes when there is no evidence that the jokes were intended as come-ons or to be abusive." Further, he defends his behavior by noting that Doe didn't object to his comments. Humor, like "tasteless jokes"—as Watkins characterizes most of his behavior—trivializes sexual harassment. MacKinnon at 52. It also places women in the catch-22 situation of either tolerating this harassment or telling their employer about their discomfort at the risk of job retaliation. It should not be the victim's responsibility to speak up when being sexually harassed at work.

To be clear, there is no "preferred" form of sexual harassment. That Watkins engaged in degrading gender discrimination rather than making sexual advances on women does not lessen the egregiousness of his behavior. Nonetheless, as we have already explained, sexual harassment encompasses both put-downs and come-ons. It also includes behaviors such as "jokes" at a woman's expense, inappropriate comments about a woman's attractiveness, offensive names for female body parts,

pornographic images, and repugnant comments about female sexuality. Watkins's misconduct encompassed most of this behavior.

Doe and the ACA are no less the victims of Watkins's harassment just because the comments, photographs, and video largely were directed at or featured other women. Despite Watkins's claim that his inappropriate behavior was only "sporadic," he created a toxic workplace culture that made it harder for these women to do their jobs.

2. *Watkins's proclaimed ignorance that his behavior was inappropriate.* We also find it troubling that Watkins excuses his behavior by noting that his conduct occurred before the #MeToo movement. Watkins explains, "[I]t may seem commonsense that [his] comments were out-of-line. But this issue was not yet at the forefront of the American consciousness, and certainly was not yet at the forefront of Mr. Watkins'[s] consciousness."

Perhaps Watkins only recently figured out that his behavior is repugnant, but sexual harassment has existed for centuries. Reva B. Siegel, *A Short History of Sexual Harassment, in Directions in Sexual Harassment Law* 1, 3 (Catharine A. MacKinnon & Reva B. Siegel eds., 2003). The #MeToo movement is not the first time that sexual harassment has been brought to the forefront of the American consciousness in popular culture. High-profile sexual-harassment charges involving famous men gripped the nation's attention in the '90s and subsequent stories of famous men who sexually harass women have continued to make news. *See* Danielle Kurtzleben, *The Trailblazers and Turning Points Along the Road to #MeToo*, Wash. Post, July 5, 2019, (Outlook), https://www.washingtonpost.com/outlook/the-trailblazers-and-turning-points-along-the-road-to-metoo/2019/07/05/5a027b42-9457-11e9-b570-6416efdc0803_story.html [https://perma.cc/RLW2-ELQP]; Peter

Weber, *The Depressingly Long History of Sexual Harassment Turning Points*, The Week, Nov. 27, 2017, (Analysis) https://theweek.com/articles/738873/depressingly-long-history-sexual-harassment-turning-points [https://perma.cc/HF3N-HTKP].

Since 1964, employees have had the option to bring legal action against employers who subject employees to unwanted sexual advances due to the enactment of Title VII of the Civil Rights Act of 1964, as amended at 42 U.S.C. § 2000e-2 (2012). In the decades since, the legal community's knowledge and understanding of sexual harassment in the workplace has grown. In 1986, the United States Supreme Court recognized sexual harassment as a violation of Title VII of the Civil Rights Act of 1964. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67–68, 106 S. Ct. 2399, 2406 (1986). Our definition of "sexual harassment" in attorney disciplinary cases is broader than the employment standard under Title VII, and we are not analyzing whether Watkins's behavior was sufficient to establish a Title VII claim. *See Moothart*, 860 N.W.2d at 603–04 (declining to adopt "a narrow definition of sexual harassment borrowed largely from employment law"). Yet, we note these basic legal concepts involving sexual harassment because, as an attorney, it seems implausible that Watkins's behavior stemmed from his claimed ignorance.

3. *Watkins's position as the elected Van Buren county attorney.* The district court in Watkins's removal decision said it best when it stated, "Many people, probably most, would consider much of [Watkins's] conduct to be outrageous or even shocking. The fact that Mr. Watkins is an attorney trained in the law makes his behavior all the more troublesome." *Watkins*, 914 N.W.2d at 836 (plurality opinion). Frankly, one need not have any legal training to know, for example, that you should not show

your female employee a picture of your wife's vagina as Watkins did to Doe in this case.

Though Watkins's actions were not criminal, it is an aggravating factor that he was an elected county attorney at the time of at least some of his sexual harassment. *See Stansberry*, 922 N.W.2d at 600 (noting an attorney's position as an assistant county attorney at the time of his acts was an aggravating factor); *Comm. on Prof'l Ethics & Conduct v. Tompkins*, 415 N.W.2d 620, 623 (Iowa 1987) (noting an attorney's misconduct was "particularly egregious" in light of his tenure as county attorney). "Lawyers holding public office assume legal responsibilities going beyond those of other citizens. A lawyer's abuse of public office can suggest an inability to fulfill the professional role of a lawyer." Iowa R. of Prof'l Conduct 32:8.4 cmt. [5]. Watkins was the very person tasked to seek justice for victims of sex crimes and domestic abuse, yet he cultivated and maintained a culture of disrespect for women within his own office. The public and our profession expects and deserves better from its elected county attorneys.

4. *The power imbalance between Watkins and Doe.* The power imbalance between Watkins and Doe is also an aggravating factor, especially given Watkins's supervisory role over Doe. *See Stansberry*, 922 N.W.2d at 597 (holding an attorney violated the rule of professional misconduct against sexual harassment in part by victimizing attorneys who had lower seniority than him in the county attorney's office). At the time, Doe was a young, inexperienced legal assistant. At its core, sexual harassment is "an issue of power," in which those in power use their status in the powerful group at the expense of those outside of that group. MacKinnon at 173. When an employer such as Watkins abuses his position of power and authority over his female employees to denigrate their positions and their very existence as women, he is maintaining a

workplace that serves to keep women from succeeding in their professions. This has a profound impact on the integrity of the legal profession.

5. *The harm Watkins caused to Doe.* Doe resigned from her work with Watkins due to his poor treatment of her, which included but was not limited to Watkins's sexual harassment. Keosauqua and Van Buren County as a whole are small in terms of population. There is not a wide range of employment opportunities in a rural community for a young woman subjected to gender discrimination. This leaves her in a particularly vulnerable position, especially when the gender discrimination involves an elected county official. Doe relinquishing her employment because of Watkins's behavior is yet another aggravating factor in this case. *See Stansberry*, 922 N.W.2d at 600 ("[W]e also consider the harm caused by the attorney's misconduct as an aggravating factor.").

**B. Mitigating Factors.**

1. *Mitigating factors considered.* The only mitigating factors we consider in this case are Watkins's cooperation in the disciplinary process and the steps that Watkins took to address his past unprofessional behaviors, including his treatment for alcoholism. Watkins cooperated fully with the ethics proceeding and stipulated to his rule violation. He also attends individual and marital counseling to address his personal and marital issues. Finally, while we commend Watkins for his success in treating his alcoholism and consider it a mitigating factor, we do not weigh this factor heavily because Watkins denies being intoxicated during the work hours and the record does not support a finding that his sexual harassment was directly linked to his intoxication. *Cf. Iowa Supreme Ct. Att'y Disciplinary Bd. v. Clarity*, 838 N.W.2d 648, 661 (Iowa 2013) ("To be considered in mitigation, the alcoholism must have contributed to the ethical misconduct . . . .").

2. *Mitigating factors the commission erroneously considered.* The commission erroneously considered certain factors in mitigation, such as Watkins's lack of prior attorney discipline. Watkins was new to the practice of law at the time of his misconduct, so he did not have much of an opportunity to warrant disciplinary action prior to the misconduct at issue. As we noted in *Iowa Supreme Court Attorney Disciplinary Board v. Sears*, the absence of prior discipline "does not weigh heavily" when the attorney being disciplined has little experience to begin with in the practice of law. 933 N.W.2d 214, 225 (Iowa 2019).

Nor do we consider Watkins's lack of experience a mitigating factor. It does not require legal experience to treat employees with basic respect in a nondiscriminatory fashion. Watkins's inexperience did not cause him to engage in sexual harassment.

3. *Watkins's proffered additional mitigating factor.* We reject Watkins's argument on appeal that we should consider the seventeen months he was removed from his duties as county attorney during the course of his removal case as a mitigating factor because he "has already been punished for his actions." Watkins's county attorney position was only part-time, and he continued to practice law in his private practice throughout the course of his removal case. Any reduction in Watkins's private practice during that seventeen-month period due to his tarnished reputation was the result of his own behavior. In any event, our "[a]ttorney disciplinary proceedings are not designed to punish the offender." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Howe*, 706 N.W.2d 360, 378 (Iowa 2005) (quoting *Comm. on Prof'l Ethics & Conduct v. Vesole*, 400 N.W.2d 591, 593 (Iowa 1987)). Instead, we determine an attorney's sanction by examining "the nature of the violations, protection of the public, deterrence of similar misconduct by others, the lawyer's fitness to practice, and [our]

duty to uphold the integrity of the profession in the eyes of the public." *Stansberry*, 922 N.W.2d at 598 (quoting *Powell*, 726 N.W.2d at 408).

**C. Summary of Our Analysis.** Watkins created and fostered a culture of sexual harassment that persisted for two years. Doe had the courage to resign and speak up about Watkins's behavior. Much of Watkins's misconduct reads like textbook examples of what not to do in the workplace. He abused the public's trust and confidence as an elected official and the county attorney tasked with seeking justice for victims of other forms of harassment. He undermined the virtues that we hold in high regard within the legal profession.

Despite his admitted embarrassment over the public backlash he received during his removal proceedings, Watkins still continues to minimize and make excuses for his behavior. The commission's thirty-day suspension sends the message that sexual harassment in the form of gender discrimination is less harmful than other forms of sexual harassment, which have received harsher sanctions. Sexual harassment in all forms is unacceptable and unethical.

In *Stansberry*, our most recent attorney disciplinary case involving sexual harassment, we sanctioned an assistant county attorney with a one-year suspension after he engaged in sexual harassment by secretly photographing female coworkers' undergarments in the office and photographing and stealing underwear from one coworker's home. *Id.* at 594, 601. We concluded that attorney violated three different rules of professional conduct, including rule violations for sexual harassment, misleading a law enforcement investigation, and his criminal convictions for the trespass of his coworker's home and the theft of her underwear. *Id.* at 596–98.

Unlike Stansberry, Watkins did not engage in criminal conduct. However, there are still several aggravating factors in this case that overlap with those we considered in determining Stansberry's sanction. These include the power imbalance of the attorney over Doe in a supervisory capacity, the attorney's position in a county attorney's office, the attorney's minimization of his acts and placing the blame elsewhere, and the harm caused by the attorney's misconduct that included Doe leaving her job. *See id.* at 599–600. Watkins's misconduct did not result in a criminal conviction or more than one disciplinary charge to warrant a one-year suspension, but this is still a rare case of first impression involving the extraordinary circumstances in which a county attorney was nearly removed from elective office due to his shocking and repeated displays of sexual harassment. We must take that into account in our decision to sanction Watkins.

We have a "duty to uphold the integrity of the profession in the eyes of the public." *Id.* at 598 (quoting *Powell*, 726 N.W.2d at 408). Sexual harassment is a problem in our profession, and our sanction in this case needs to reflect the seriousness of this problem to deter similar misconduct by other attorneys and "uphold the integrity of the profession in the eyes of the public." *Id.* (quoting *Powell*, 726 N.W.2d at 408). We have repeatedly stated our intention in discipline cases "to achieve consistency with our prior cases when determining the proper sanction." *See, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Templeton*, 784 N.W.2d 761, 769 (Iowa 2010). Our holding today sets the precedent for similar cases in the future. The proper sanction in this case is the suspension of Watkins's license to practice law for an indefinite period with no possibility of reinstatement for six months from the filing of this opinion.

**V.  Disposition.**

We suspend Watkins's license to practice law in Iowa for an indefinite period with no possibility of reinstatement for six months from the date of filing of this opinion.  Watkins must comply with the notification requirements of Iowa Court Rule 34.24.  To establish his eligibility for reinstatement, Watkins must file an application for reinstatement meeting all applicable requirements of Iowa Court Rule 34.25.  We tax the costs of this action to Watkins in accordance with Iowa Court Rule 36.24(1).

**LICENSE SUSPENDED.**

All justices concur except Waterman, J., who takes no part.